**In the Interest of K.C.M., a Child.**

**No. 01–98–00133–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Oct. 7, 1999.

Rehearing Overruled Nov. 4, 1999.

William B. Connolly, Houston, Attorney ad litem.

Barbara W. Ramirez, Houston, for Appellant.

Lisa S. Rice, Patricia Lee Flenniken, Casey Todd Wallace, Houston, for Appellee.

Panel consists of Justices MIRABAL, HEDGES, and SMITH.*

## OPINION

MIRABAL, Justice.

This is a termination of parental rights case.

The mother, Kimberly Lyne Martin, appeals the judgment terminating her parental rights to her son, K.C.M., arguing that the termination statute is unconstitutionally vague, and that the evidence is insufficient to support the termination. The attorney ad litem for the child, who was appointed to represent the best interests of the child, also disputes the sufficiency of the evidence and argues for reversal of the judgment.[1] We reverse and remand.

### Case Background

K.C.M., a male, was born on December 30, 1994. On August 6, 1996, when K.C.M. was 19 months old, the Texas Department of Protective and Regulatory Services (TDPRS), took possession of K.C.M.

The next day, August 7, 1996, TDPRS filed a "suit for the protection of a child in an emergency and original petition in suit to affect parent-child relationship," stating

---

* The Honorable Jackson B. Smith, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1. The attorney ad litem filed a brief, which we received as an amicus brief under TEX.R.APP. P. 11.

there was an immediate danger to K.C.M.'s health or safety and seeking temporary custody. The trial court issued an initial emergency order approving the removal of K.C.M. from his parents and appointing TDPRS as his sole temporary managing conservator pending a hearing. Following a hearing held August 19, 1996, the trial court appointed TDPRS as temporary managing conservator.

In February 1997, TDPRS presented a family service plan that sought family reunification, not termination of parental rights. Two weeks later, on March 3, 1997, TDPRS filed a first amended petition, seeking for the first time to terminate the parent-child relationships between K.C.M. and his mother and father. On September 18, 1997, the Associate Judge conducted a one-day bench trial to hear the termination suit. At the close of trial, the Associate Judge announced his ruling from the bench that both parent-child relationships were to be terminated, and that TDPRS was to be appointed sole managing conservator. On October 6, 1997, the trial court signed a Decree for Termination, which adopted the Associate Judge's recommendation. The mother, Kimberly Lyne Martin, appeals.[2]

## Constitutionality of the Family Code

■ In her first point of error, Martin asserts the relevant statute, section 161.001 of the Family Code, is unconstitutionally vague and ambiguous. Martin raises this complaint for the first time on appeal. Accordingly, Martin waived this point by not presenting it to the trial court. TEX.R.APP. P. 33.1; *Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex.1993).

We overrule point of error one.

2. The father is not a party to this appeal.

3. Although the current version of section 161.001 of the Family Code applies only to suits filed on or after September 1, 1997, the relevant provisions were not changed by the

## Sufficiency of the Evidence

In points of error two and three, Martin asserts the evidence was legally and factually insufficient to support the trial court's findings.

To terminate parental rights, the trial court must make two findings. First, the parent must have committed one of the acts prohibited under section 161.001(1) of the Texas Family Code. TEX. FAM.CODE ANN. § 161.001(1) (Vernon Supp.1999);[3] *Richardson v. Green*, 677 S.W.2d 497, 499 (Tex.1984). Second, termination of parental rights must be in the child's best interest. TEX. FAM.CODE ANN. § 161.001(2); *Richardson*, 677 S.W.2d at 499. The trial court made the findings that Martin committed the act prohibited under section 161.001(1)(E), and that termination was in the child's best interest; the Decree for Termination states:

> The Court finds by clear and convincing evidence that termination of the parent-child relationship between Kimberly Lyne Martin aka Kim Cressa, and the child, [K.C.M.], is in the best interest of the child and further that the mother:
>
> engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.

■ "Endanger" means to expose the child to loss or injury or to jeopardize. *In re M.C.*, 917 S.W.2d 268, 269 (Tex.1996) (per curiam). "Best interest of the child" is to be determined from consideration of the following factors:

1. The child's desires;

2. The child's physical and emotional needs, now and in the future;

3. The emotional and physical danger to the child, now and in the future;

amendments. *See* Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 TEX. Gen. Laws 113, 212–13 (amended 1997) (current version at TEX. FAM.CODE ANN. § 161.001 (Vernon Supp.1999)).

4. The parental ability of the individuals seeking custody;

5. The programs available to assist these individuals in promoting the child's best interest;

6. The plans for the child by the individual or agency seeking custody;

7. The stability of the home or proposed placement;

8. The parent's act or omissions that may indicate the existing parent child relationship is not a proper one; and

9. Any excuse for the parent's acts or omissions.

*Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976). There is a strong presumption that the best interest of the child is served by keeping custody in the natural parent. *Allred v. Harris County Child Welfare Unit,* 615 S.W.2d 803, 806 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). It is the TDPRS's burden to rebut this presumption. *See In re R.E.W.,* 545 S.W.2d 573, 581 (Tex.Civ.App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.).

■ The termination of parental rights involves fundamental constitutional rights. *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972); *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985). Evidence supporting the findings to terminate parental rights must be clear and convincing, not just preponderate. TEX. FAM.CODE ANN. § 161.001; *In the Interest of G.M.,* 596 S.W.2d 846, 847 (Tex. 1980); *Harris v. Herbers,* 838 S.W.2d 938, 941 (Tex.App.—Houston [1st Dist.] 1992, no writ). The clear and convincing standard of proof is intentionally placed on the party seeking the termination of the parental rights, so as to create a higher burden to fulfill, because of the severity and permanence of the termination of the parent-child relationship. *Spurlock v. Texas Dep't of Protective & Regulatory Servs.,* 904 S.W.2d 152, 155 (Tex.App.—Austin 1995, writ denied); *Harris,* 838 S.W.2d at 941. This standard requires more proof than the preponderance of the

evidence standard in civil cases, but less than the reasonable doubt standard in criminal cases. *G.M.,* 596 S.W.2d at 847; *In the Interest of J.N.R.,* 982 S.W.2d 137, 141 (Tex.App.—Houston [1st Dist.] 1998, no pet.); *Harris,* 838 S.W.2d at 941. The clear and convincing standard is the degree of proof that will produce in the mind of the trier of fact a "firm belief or conviction" as to the truth of the allegations sought to be proved. *G.M.,* 596 S.W.2d at 847; *J.N.R.,* 982 S.W.2d at 141; *Harris,* 838 S.W.2d at 941.

■ On appeal, in evaluating the sufficiency of the evidence supporting a trial court's decision to terminate parental rights, the standard of review is not affected by the heightened burden of proof required in the trial court. *J.N.R.,* 982 S.W.2d at 141; *see also Edwards v. Texas Dep't of Protective and Regulatory Servs.,* 946 S.W.2d 130, 137 (Tex.App.—El Paso 1997, no writ). In conducting a legal sufficiency review, we consider only the evidence and inferences tending to support the fact finding, and we disregard all contrary evidence and inferences. *See Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex. 1996); *Edwards,* 946 S.W.2d at 137; *In the Interest of H.C.,* 942 S.W.2d 661, 664 (Tex. App.—San Antonio 1997, no writ). If any evidence of probative force exists to support the finding, we will uphold the decision. *Edwards,* 946 S.W.2d at 137. In conducting a factual sufficiency review, we view all of the evidence; we will sustain a factual sufficiency challenge only if, after viewing all the evidence, we conclude the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996) (per curiam); *Hollander v. Capon,* 853 S.W.2d 723, 726 (Tex.App.—Houston [1st Dist.] 1993, writ denied).

### The Evidence

Kimberly Martin, the mother, testified she started smoking marihuana when she

was 13 years old. Both of her parents were drug addicts.

Martin admitted she smoked marihuana at the end of her pregnancy with K.C.M. When Martin came home from the hospital after K.C.M.'s birth, TDPRS contacted her. On January 2, 1995, when K.C.M. was three days old, Martin signed a "Child Safety Evaluation Plan" prepared by TDPRS. The Plan provided that Martin agreed to random drug testing by TDPRS, and that K.C.M.'s paternal grandmother, Joanne Arnold, would monitor the situation. Martin was living with Arnold. Martin admitted that she went through some drug screenings, and she tested positive for marihuana. According to Martin, TDPRS soon stopped monitoring the family because K.C.M. was healthy.

When K.C.M. was one-year-old, TDPRS was back in contact with the family pursuant to a complaint. On January 23, 1996, Martin signed a new "Child Safety Evaluation Plan" that provided she and K.C.M.'s father would submit to a drug assessment at "New Spirit" on January 30, 1996; that until then, they would refrain from using any drugs; and that they would not leave K.C.M. unsupervised at any time.

Martin admitted that, in 1996, she was using crack cocaine on a daily basis, and even on an hourly basis. She testified that she never used crack cocaine in front of K.C.M.; when she ingested crack in Arnold's house, K.C.M. would always be in another room. Martin financed her drug habit through prostitution.

During that period of time, the paternal grandmother, Ms. Arnold, and the father were caring for K.C.M. Ms. Arnold kicked Martin out of the house because of her prostituting and drug abuse; Ms. Arnold continued to care for K.C.M. Martin felt she was leaving K.C.M. in an "okay" situation when she left him with Ms. Arnold, because TDPRS had designated Ms. Arnold as the "safety person" over K.C.M.

Martin did not attend more than four sessions of the "New Spirit" drug therapy because, "I was too into drugs. It was too hard to let go.... I was too addicted." Later in 1996, Martin was enhancing her cocaine use with marihuana.

On August 26, 1996, Martin was arrested for possession of less than one gram of crack cocaine, and she was placed on deferred adjudication probation. This was the first time she had ever been arrested. On November 26, 1996, Martin was again arrested, this time for possession of a crack pipe. She was adjudicated guilty of the original offense and sentenced to one-year confinement in a state jail. At the time of the September 18, 1997 trial in the present case, Martin had only 75 more days to serve in jail; her release date was set for December 3, 1997.

While in jail, Martin wrote letters "all the time" to Ms. Blake, the TDPRS caseworker, inquiring about K.C.M. Martin was on a waiting list to get into a therapeutic drug program at the jail. She attended an Alcoholics Anonymous (AA) substance abuse program, and completed a parenting program offered at the jail. Respondent's exhibit number one is a "Certificate of Participation" dated August 26, 1997, certifying that Martin had completed the course "Systematic Training for Effective Parenting (STEP)." Additionally, Martin took courses in women's health, life skills, and career skills. Respondent's exhibits numbers two and three are certificates of completion for the "Life Skills" and "Career Exploration" courses. Further, Martin had taken GED courses, and at time of trial was waiting for the results from her GED exam.

At the time of trial, Martin held a "low risk" inmate position at the state jail; she had been assigned the job of floor cleaning. Martin testified she had been sober for ten months. She planned to continue attending AA meetings and Narcotics Anonymous (NA) meetings, and planned to enter any type of drug therapy program that was recommended by TDPRS. Martin testified that she loved her son, and

that he was the most important thing to her in her life.

Robert Johnson, the father, testified that he and Martin used drugs and they were around K.C.M. when they were high. He too denied using drugs in the same room as K.C.M. He confirmed that Martin had smoked marihuana toward the end of her pregnancy.[4]

Michelle Blake, the primary TDPRS caseworker, testified that she was assigned to the case on September 16, 1996, approximately one month after K.C.M. had been taken into protective custody. Her job was to develop a family service plan and to refer the family for services. During October 1996, Martin called Blake several times to inquire about her son. Blake scheduled a meeting with Martin to prepare a family service plan on October 21, 1996, but Blake had to cancel the meeting and reschedule for October 28. Martin called and had to cancel the October 28 meeting, and she did not show up at Blake's office the next day. Blake and Martin spoke by phone on November 15, 1996 and Blake told Martin that "we needed to get together and do a service plan and that we would be recommending a drug treatment program for her." A few days later, Martin was arrested. From December 1996 on, while Martin was in jail, she wrote to Blake several times inquiring about her son and requesting pictures. In several letters, Martin wrote that she wanted to get into drug rehab.

Blake testified that TDPRS recommended that Martin's parental rights be terminated "so that this child can be free for adoption." She asked that TDPRS be named as managing conservator.

If TDPRS deferred the termination suit, and established a plan with Martin after she got out of prison in 75 days, and assuming Martin successfully completed the requirements (completing a drug abuse program, taking parenting courses, re-

maining drug free, obtaining a legal job, and maintaining a stable home), it would be at least another year before K.C.M. could be returned to Martin's custody. By the same token, an adoption could also take six months to a year to be accomplished. K.C.M.'s current foster mother was presently adopting another child, and she had not expressed an intention to adopt K.C.M.

Blake also explained that TDPRS had considered placing K.C.M. with relatives, but had determined there were no viable options. The agency conducted studies of three available homes. Of the three home studies, two were disapproved (Kenneth and Joanne Matthews, a paternal aunt and uncle; and Fredonia Welch, K.C.M.'s great-grandmother). The third study was approved (Donna Lee, a maternal great-aunt), but she changed her mind and did not want K.C.M. placed with her.

On February 14, 1997, Blake proposed a family service plan for the family. Blake knew the entire history of K.C.M's mother and father at that time, and it was TDPRS's plan as of February 1997, to seek family reunification; TDPRS was not seeking termination of the parent-child relationships at that time, but rather was planning on a permanency plan for the family. On February 13, 1997, Martin was in jail, and had been there since the preceding November. Blake testified:

Q. [By mother's attorney]: You also wrote a family service plan for the mother [in] February of 1997; is that correct?

A. [By Blake]: Yes, that is correct.

Q. And in that plan the agency made on February 13, 1997, they stated a specific plan; goals that you want to improve yourself as an appropriate parent; is that correct?

A. Yes.

---

4. Johnson also testified about his relationship with K.C.M., his job, and his improved drug status at the time of the trial. However, none of that testimony is relevant for Martin, who is the only parent appealing the termination.

Q. And on the next page where there was family tasks, the tasks for Kimberly Martin in February of '97, was to contact the agency once she is released from TDC and participate in a family service plan for family reunification?

A. Right. ⌐

. . .

Q. [By child's attorney ad litem]: Okay. How about the Mom? What has she done since February 14th since your service plan is saying reunite with family? What has she done that would endanger this child?

A. [By Blake]. She has done nothing to endanger him. Right, but be in jail.

. . .

Q. Okay. You would agree with me would you not that you saw some of the stuff that Kimberly is going through [in jail], parenting education and some other stuff. Isn't that pretty similar in description as to what the agency would offer her and had offered her?

A. Well, we would offer a parenting education course that's 10 weeks long. We would recommend inpatient drug treatment for her and we would want her to be able to show that she can provide a stable home and environment for [K.C.M.] and financial ability to provide.

Q. Did you hear that she was willing to do whatever was necessary including go to drug treatment and be a stable parent as part of what you described as your plan for her?

A. Yes, I heard that.

Fredonia Welch, Martin's grandmother, testified that she wanted to take care of K.C.M., but TDPRS denied her home study because she is already taking care of three other grandchildren. Welch would be willing to help Martin after she is released from jail. Welch thinks Martin will be fine as long as she avoids drugs. Welch has limited financial resources. Welch also discussed problems she had with another adult relative who stayed with her at one time, but felt she had learned how to better handle disruptive situations.

Sharon Wheeler, K.C.M.'s foster mother, testified that K.C.M. is a beautiful, blonde-haired, blue-eyed child, who is angelic looking. When he first arrived at her home, he rarely spoke and did not look like a very happy child. Based on these traits, Wheeler initially thought K.C.M. had developmental problems. However, after a few months, he suddenly snapped out of it. He now has a colorful personality. She is concerned that he currently gets so upset when she disciplines him. She would consider adopting K.C.M., but has not discussed it because she knows he is not available for adoption until the parents' rights are terminated.

### Legal Sufficiency of Evidence

 Considering only the evidence and inferences tending to support the trial court's fact findings, and disregarding all contrary evidence and inferences, we conclude the evidence is legally sufficient to support the findings that Martin engaged in conduct that endangered the physical or emotional well-being of K.C.M. The evidence regarding Martin's drug addiction and the affect it had on her life and her ability to parent, considered alone, constituted legally sufficient evidence to support a finding by clear and convincing evidence that Martin's conduct endangered the child and that termination of the parent-child relationship was in the best interest of the child.

We overrule points of error two and three to the extent they attack the legal sufficiency of the evidence.

### Factual Sufficiency of Evidence

 Reviewing all of the evidence, including evidence that is contrary to the trial court's findings, we consider the fol-

lowing, uncontroverted evidence to be particularly compelling:

1. Martin had been drug-free and sober for 10 straight months preceding the trial;

2. While in the state jail in Dayton, Texas, Martin engaged in the following activities:

 a. She wrote letters on a consistent basis to the TDPRS case worker, inquiring about K.C.M., requesting pictures, and requesting assistance to get into a drug rehabilitation program;

 b. She attended an AA program;

 c. She completed parenting classes;

 d. She completed a "Life Skills" course;

 e. She completed a "Career Exploration" course;

 f. She took a women's health course;

 g. She completed GED courses and was waiting for the results from her GED exam;

 h. She had become a jail trustee, a "low risk" inmate position;

 i. She had gotten on a waiting list for a therapeutic drug program at the jail.

3. As of February 1997, when Martin was already in the state jail, the TDPRS was recommending family reunification upon Martin's release from jail, not termination of parental rights. From February 1997 through the date of trial in September 1997, Martin remained in state jail engaging in self-improvement activities. From February 1997 through the date of trial, Martin did nothing to endanger K.C.M., but be in jail.

4. Martin would be released from jail 75 days after the trial.

5. The amount of time necessary to complete an adoption for K.C.M. could take about one year, comparable to the amount of time probably necessary for Martin to successfully complete the TDPRS's requirements for K.C.M. to be returned to Martin's custody.

6. Before K.C.M. could be returned to Martin by TDPRS, she would be expected to attend a parenting course and a drug treatment program, and she would have to show she could provide a stable home and environment for K.C.M. and that she had the financial ability to provide for K.C.M.

The attorney ad litem who was appointed to represent the best interests of the child, along with Martin's attorney, fervently argue that in Martin's case, "jail turned her life around." The evidence supports their argument.

Mindful that there is a strong presumption that the best interest of the child is served by keeping custody in the natural parent, we have weighed the totality of the evidence against the factors set out in *Holley*, 544 S.W.2d at 371–72. We conclude that the trial court's finding, that the "clear and convincing evidence" showed that termination was in the best interest of the child, is against the great weight and preponderance of the evidence and is clearly unjust. In light of the uncontroverted evidence of the progress Martin had made while in jail, a "firm belief or conviction" that the best interest of K.C.M. required termination of Martin's parental rights could not be fairly reached.

Accordingly, we sustain point of error three to the extent it attacks the factual sufficiency of the evidence to support the "best interest" finding.

We reverse the judgment terminating the mother's parental rights, and we remand that portion of the case to the trial court.