Reversed and Rendered in Part and Affirmed in Part and Majority and
Concurring Opinions filed May 29, 2003









Reversed and Rendered in Part and Affirmed in Part and Majority and
Concurring Opinions filed May 29, 2003.                                                                                                                                   

 

 

 

 

 

                                                                                                                                                            

                                                                                                                                                            

 

In The

 

Fourteenth Court of Appeals

____________

 

NO.  14-02-00583-CV

____________

 

IN
THE INTEREST OF M.G.D. AND B.L.D.

 

 



 

On
Appeal from the 300th District Court

Brazoria County, Texas

Trial
Court Cause No.  14236*RH00

 



 

M
A J O R I T Y   O P I N I O N

Appellant
Brazoria County Children=s Protective Services, Inc. (ACPS@) sought termination of T.D.=s parental rights to her two children, M.G.D. and B.L.D., ages
six and seven.  After a five-day trial,
the jury found termination would be in the children=s
best interest.  The trial judge disagreed
and granted judgment notwithstanding the verdict, ordering the children left in
foster homes until T.D. might be ready to parent them at some time in the
future.  CPS appeals the trial court=s
order; T.D. cross-appeals challenging the factual sufficiency of the jury=s
verdict.  We reverse and render judgment
in accordance with the jury=s verdict.








The
Evidence

T.D.
grew up in circumstances where physical and sexual abuse, drug addiction, and
criminal problems were the norm.  Her
mother abused drugs and alcohol and lived with a series of abusive boyfriends.  Her father (by her own admission) was
normally either in prison or away driving trucks.  As a small child, she was abused by several
of her mother=s boyfriends, and spent several months in foster care.

At
age 13, T.D.=s mother expelled her from home, the first of many times.  On her own, T.D. established a domestic
pattern very much like the one in which she had been raised.  She had her first child when she was 15, her
second at 16.  By the time of her first
arrest (for aggravated assault in 1997), she was addicted to cocaine, had lived
with a series of violent and abusive boyfriends, and supported herself by
peddling narcotics.  

The
conditions in which she raised her toddlers were deplorable.  An initial investigation in Galveston found
dog droppings throughout her house and the children  infested with lice.  On a second visit, the children (then ages
three and four) were at home unsupervised. 
After she agreed to a family service plan that required her (among other
things) to notify the local authorities of any plans to move, the children were
returned to her custody.  Nevertheless,
she left the county without notifying anyone, thus forestalling any further
investigation or intervention.

Sometime
later, Brazoria County police responded to a report of neglect at T.D.=s
new home.  They found her children
without food, infested with lice, and surrounded by filthy conditions
throughout the home.   Rotten and
inedible food filled the refrigerator, sanitary napkins and other trash filled
the bathtub, and soiled sheets were on in the children=s
beds.  Large amounts of cocaine,
marijuana, and hashish lay throughout the home within easy reach of the
children.








From
1999 until August of 2000, T.D. served time in prison on narcotics charges and
for endangerment of her children.  She
did not see the children, made no phone calls to them, and sent them only a
handful of letters.  Shortly before her
release, CPS notified her of the filing of parental termination proceedings.

Following
her release, T.D. resided in three different places, twice with convicted
felons (a boyfriend and a cousin). 
Finally, she moved to a location several hours away from her children to
be with her occasional boyfriend, and to get a job in construction.  She admitted this boyfriend had physically
abused her before she went to prison, but maintained there had only been verbal
abuse since her release.  At CPS=s
insistence, she left this boyfriend (as she had several times before) six
months prior to trial.  

By
contrast, it was uncontradicted the children had
settled into a satisfactory foster family after a succession of false
starts.  They were removed from their
first home after several incidents of their inappropriate sexual behavior.  When termination papers were filed, they were
removed from the second foster home in order to place them with a family
interested in adopting them.  All
witnesses agreed the children were now in a stable home in which their
emotional and physical needs were being met. 
Their current foster mother testified they were happy, healthy, and
finally making great improvement in a family that wanted to adopt them. 

Legal
Sufficiency








            The
trial court disregarded the jury=s verdict that termination was in the best interest of the
children.[1] 
This was proper
only if no evidence supports the jury=s finding.[2]  Because termination of parental rights must
be based upon clear and convincing evidence,[3]
the standard is whether no reasonable juror could form a firm belief or
conviction that termination was in their best interest.[4]  When evidence is disputed, we consider only
the evidence supporting the jury verdict if a reasonable juror could have
disbelieved the contrary evidence.[5]

No
one disputes there was clear and convincing evidence that T.D. committed
several of the statutory grounds that justify termination.[6]  Proof of such acts can serve as evidence of a
child=s
best interest.[7]
T.D.=s
life of narcotics, crime, and abusive relationships placed the children in harm=s
way from the day they were born until the day they left her.  This evidence also supports the jury=s
finding as to the children=s best interest.[8]


By
her own admission at trial, T.D. did not want the children living with her, as
she was Anot
ready.@  She had moved frequently, and anticipated
another move in the near future.  She
admitted the travel trailer in which she lived was inappropriate, but did not
indicate how she might afford anything better. She had few ties with any community
or support groups: she had quit attending AA meetings, had no AA sponsor, and
attended no church.

Nor
did she have any family members who could help and support her.  Her mother died while she was in prison; her
father got out of prison shortly before her trial; her only brother remained in
prison; she did not know where her only sister was.  CPS tried to place the children with her
aunt, but rejected the idea upon finding the aunt=s boyfriend was another convicted felon.  At trial, T.D. mentioned a cousin in
Galveston who might help her, but admitted she had not asked, and that her
cousin already had four children of her own. 

In
sum, T.D. was in no position to begin parenting her children, and was unable to
suggest anyone (other than CPS) who was. 
For the foreseeable future, her basic plan for the children was that
someone else should keep raising them for her. 









But
there was testimony that leaving the children in foster homes (which the trial
court=s
order did) would deprive them of the permanence and stability they needed.  While T.D. pleaded for more time to ready
herself for parenting, there was no indication how long that might be or what
effect this would have on the children=s development in the interim.

In
her brief, T.D. makes two arguments in support of the trial court=s
judgment.  First, she points out only two
witnesses testified directly regarding the children=s
best interest.  One of them (the guardian
ad litem) opined that termination was not in their
best interest.  The other (a CPS
caseworker) testified to the contrary, but admitted she had little personal
contact with T.D., had never visited T.D.=s home, and had not been involved in the case for over a
year.  Thus, T.D. says there was no
evidence to support the jury=s finding.

It
is true CPS presented few fact and expert witnessesCits
designation of other witnesses was late, and T.D. successfully moved to exclude
them.  But nothing in this area of the
law limits jurors to the opinions of experts. 
Surely, they may apply their own experience and common sense to the
facts to draw conclusions regarding a child=s best interest.  Expert
testimony may well be helpful in termination cases, but there is no reason to
think jurors are unqualified to form their own opinions about whether someone
is likely to provide a stable and healthy home. 


Second,
T.D. is critical of CPS=s efforts to help her be a better parent.  She points out the agency decided to seek
termination while she was still in prison, and successfully prevented her from
seeing her children for four months after her release.  The guardian ad litem
gave his opinion that CPS personnel had not given T.D. Aa
fair shot@ at regaining her children. 









But
this ignores the efforts of various agencies working with T.D. before her
incarceration, none of which met with any success.  Moreover, everyone agrees the events leading
up to her incarceration justified CPS=s decision to seek termination. 
Once that decision was made, it is not clear why the agency should have
poured greater resources into bringing about the opposite result.   

Additionally,
resolving disputed facts (as we must) against T.D., her difficulties since
release from prison are not so much CPS=s fault as her own. 
While she blamed distance and car trouble for her occasional absences
from therapy sessions and visitation with the children, she admitted it was her
own decision to move so far away.  While
she blamed a lack of funds for the infrequency of her calls to the children or
cards or gifts on birthdays and holidays, she admitted spending money regularly
on cigarettes.  And while she blamed her
lack of emotional connection with the children during recent visitations on the
less-than-ideal circumstances in which they occurred, reasonable jurors could
have believed her past behavior and long absence from them played at least as
important a role.  

Indeed,
viewed from the proper perspective (in favor of the jury=s
verdict), much of T.D.=s recent improvements came from CPS=s
insistence rather than her own initiative. 
She complains the agency should have spent more time and money teaching
her how to be a better parent; reasonable jurors could have decided the
children=s
best interest lay with someone who did not have to be told. 

Finding
that reasonable jurors could form a firm belief or conviction that termination
was in the best interest of the children, we hold the trial court erred in
granting judgment n.o.v.

Factual
Sufficiency








            In
her cross-appeal, T.D. argues the evidence was factually insufficient to
support the jury=s best interest verdict. 
Again, we must give due deference to the jury=s
fact-finding role by resolving disputed evidence in favor of the verdict if a
reasonable person could have found it to be clear and convincing.[9]  The evidence is factually insufficient only
if evidence remains that is both contrary to the verdict and so significant
that jurors could not reasonably form a firm belief or conviction that
termination was in the children=s best interest.[10]

As
detailed above, the jury could have resolved much of the conflicting evidence
in favor of its verdict.  But not
all.  It was undisputed that after her
release from prison T.D. successfully completed parole, obtained a good job
(working seven days a week for twelve-hour shifts), and broke away (eventually)
from an abusive boyfriend.  It was also
undisputed that she had complied in all but minor respects with a family
service plan, completing substance abuse and parenting classes, and apparently
remaining drug-free.  T.D. argues this
recent evidence is much more significant than the evidence justifying
termination (most of which took place before her incarceration), thus rendering
the earlier evidence factually insufficient. 

Our
sister court appears to adopt this position in a recent case, In re K.C.M.[11]  The facts in that case were similar to those
detailed here, including evidence that the mother had Aturned
her life around@ in jail by remaining sober for ten months and completing
substance abuse, parenting, and other classes.[12]  The K.C.M court held her personal
progress and compliance with a family service plan rendered the earlier
evidence regarding crime and narcotics factually insufficient to support the
jury=s
finding that termination was in the child=s best interest, and ordered a new trial.








For
several reasons, we disagree with the K.C.M. court that such evidence
necessarily makes a best interest finding in favor of termination factually
insufficient.  First, the significance of
a personal turnaround depends to some degree on what the turnaround is
from.  Termination may no longer be in
the best interest of a child whose parent had a mental disorder that has been
cured,[13]
or who made a single misjudgment.[14]  But such cases are hardly comparable to a
parent struggling to escape the kind of life-long addictions and abusive
relationships that have dominated most of T.D.=s short life.

Clearly,
jurors are not required to ignore a long history of dependency and abusive
behavior merely because it abates as trial approaches.[15]  Physical, sexual, and narcotics abuse
sometimes reappear, sometimes even in later generations, because they are hard
to escape.  As T.D. herself admitted,
several months of substance abuse and parenting classes, or 18 months of
apparent sobriety, are no guarantee that her problems will not recur.  With these kinds of addictions, it may take
significantly more time before one can safely say they are so remote as to
constitute Athe distant past.@ 








Instead,
evidence of a recent turnaround should be determinative only if it is
reasonable to conclude that rehabilitation, once begun, will surely
continue.  Reasonable people could hold a
firm conviction that, in circumstances like those presented here, that is not
always the case.  T.D.=s
efforts to overcome the cycle of abusive relationships and addiction that have
plagued her family for several generations should be applauded; but we cannot
say they require every rational juror to return her children to her.  Certainly reasonable people could look at
T.D.=s
progress and decide it justified the risk of keeping her as their parent rather
than allowing anyone else the privilege. 
But these jurors did not; we cannot say they were unreasonable in firmly
deciding the children=s best interest lay elsewhere.

Second,
we disagree that compliance with an agency=s family service plan also renders termination impossible.  It is true that in many cases failure to
comply with a family service plan is cited as evidence favoring termination.[16]  But for several reasons we believe the
converse is not always the caseCthat compliance with a plan means termination cannot be in a
child=s
best interest.

There
are limits to what government programs can do. 
The elements of a safe, stable, and happy childhood cannot all be
reduced to a checklist in a service plan. 
Nor can CPS provide 24-hour surveillance of at-risk children.  As the dangers involved in a parent=s
circumstances increase, so does the risk noncompliance with a service plan may
not be discovered until (from the child=s perspective) it is far too late.  

There
are also limits to the programs an agency like CPS can require.  For example, the judge here ordered T.D. to
repeat classes in parenting and substance abuse, even though she had completed
several of them already.  It is not clear
what additional benefits she would gain from taking these classes again and
again.  But then, what else could she be
ordered to do?

Undoubtedly,
counseling sessions, parenting classes, and substance abuse programs sometimes
have remarkable successes, but none guarantee that result for every
attendee.  Reasonable jurors might look
at T.D.=s
compliance with a family service plan and decide against termination.  But, again, these jurors did not.  And we cannot say that compliance with such a
plan necessarily renders a firm conviction to the contrary unreasonable.








Third,
it is not entirely clear  what will be
gained by remanding cases like K.C.M. and this one for a second trial.[17]  A new trial cannot change the life T.D.
previously led, and what her children lived through as a result.  Nor can repetition of behavior-modification
classes similar to those she has already taken tip the best-interest analysis
much.  While there would be evidence on
remand as to her behavior in the interim, there would still be no guarantee
(for the reasons discussed above) as to what the future might hold.

And
it would be bought at a heavy price: keeping the children in an unreal world
where they do not know whoCif anyoneCis their real parent.  By
refusing to follow the jury=s finding in favor of termination, the trial court prevented
anyone else from adopting them.[18]  But by appointing CPS as the children=s
permanent managing conservator, it becomes that agency=s
duty to provide them with food, clothing, shelter, education, discipline,
health care, and religious training, and perhaps even to walk them down the
aisle if they marry.[19]








There will always be a temptation to find a middle way between
leaving a child in a dangerous situation and terminating all possibility of
reunification.[20]  But such compromises inevitably mean leaving
the children in limbo, when what they need is permanency and security.[21]  By requiring all
termination suits to be completed within a year,[22]
the Legislature made clear that courts cannot leave children in foster homes
indefinitely while existing parents try to improve themselves and their
conditions.[23]


But
K.C.M. defeats this purpose.  If a
parent is making progress but clearly is not yet ready to resume parenting,
declaring all evidence in favor of termination factually (though never legally)
insufficient assures the children will be left hanging.  They cannot be adopted; nor can they be
returned to a parent.  We cannot simply
keep reversing verdicts for factual sufficiency, no matter how many years it
may take parents to arrive at the point where they can capably raise the
children again.  

Instead,
we believe a parent=s recent turnaround and compliance with a family service plan
are factors jurors should consider, but not determinative ones.  If the facts involved show progress may take
a very long time, or a child will remain at-risk nonetheless, reasonable jurors
may conclude that termination is clearly and convincingly in the child=s
best interest.  

Here,
the guardian ad litem and the trial judge concluded
termination was not in the children=s best interest, but it was not their call to make.  Rather than entrusting this important
question to lawyers, our legislators (not to mention the state and federal
constitutions) entrust the question to jurors. 
It was for them to decide why T.D. was having difficulty reconnecting
with her children, and whether giving her additional time by leaving them in
foster care was in their best interest. 
It was also up to them to balance her recent reform against the risk of
recurrence of the many problems from her not-too-distant past.  

Based
on our review of the record and the facts set out above, we find a reasonable factfinder could form a firm belief or conviction that
termination was in the children=s best interest.  Accordingly,
we overrule T.D.=s conditional cross-point challenging the factual sufficiency
of the evidence.








Court-Appointed
Appellate Counsel

In
a second point, Brazoria CPS alleges the trial court abused its discretion by
appointing appellate counsel for T.D.. 
Before a trial court may do so, the court must order the appealing party
to file an affidavit of indigency, hold a hearing
within 30 days of its final order, and sign an order within 36 days of the
final order.[24]  Here, T.D. timely filed a sworn post-judgment
motion for appointment of appellate counsel, and alleged she had no funds to
pay an attorney.  But the trial court did
not order her to file an affidavit setting out the details of her indigency, and did not hold a hearing on her motion until
the 35th day after the final order was signed. 
T.D. nevertheless presented substantial testimony of her indigency at the hearing, and her motion was granted on the
36th day, the statutory deadline. 

The
statute does not say what should happen in these circumstances; that the
deadlines are mandatory does not tell us the consequences of the trial court=s
failure to comply.[25]  But the purpose of the statute generally is
to the reduce post‑judgment appellate delays, not to deprive an appellate
court of jurisdiction.[26]  CPS does not indicate how it was harmed by
the trial court=s failure to require an affidavit of indigency
or hold the hearing within 30 days, or cite any authority that either failure
requires the motion to be denied.  








Trial
courts generally may allow a defective affidavit of indigency
to be amended, or supplemented with testimony at the hearing.[27]  Additionally, although the statute does not
say what should happen when the hearing deadline passes, it does say the motion
should be granted if the order deadline is missed.[28]  Accordingly, based on T.D.=s
testimony proving indigency at the hearing, we find
the trial court did not abuse its discretion by granting the motion within 36
days of its final order.  

The
judgment n.o.v. is reversed and judgment rendered in
accordance with the jury=s finding that termination of the parent-child relationship
between both of the children, M.G.D. and B.L.D., and T.D., would be in the
children=s
best interest.  The remainder of the
judgment unrelated to T.D.=s parental rights is affirmed.                         

 

 

 

/s/        Scott
Brister

Chief Justice

 

 

 

 

Judgment rendered and Majority and
Concurring Opinions filed May 29, 2003.

Panel consists of Chief Justice Brister and Justices Hudson and Frost. (Frost, J.
concurring).











[1]  See
Tex. Fam. Code ' 161.001(2).





[2]  See
Mancorp, Inc. v. Culpepper,
802 S.W.2d 226, 227 (Tex. 1990).  





[3]  See
Tex. Fam. Code
' 161.001.





[4]  See
In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002).





[5]  Id.





[6]  See
Tex. Fam. Code '' 161.001(1)(D), (E),
(L), (O), & (Q). 





[7]  See
In re C.H., 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both parts
of section 161.001).





[8]  See
id. (holding parent=s past behavior was evidence of his fitness as a
parent).





[9]  See
In re J.F.C., 96 S.W.3d at 266.





[10]  Id.





[11]  4 S.W.3d 392 (Tex.
App.CHouston
[1st Dist.] 1999, pet. denied).





[12]  The K.C.M court
applied only the usual factual sufficiency standard of review, an approach
expressly disapproved by the Supreme Court. 
See In re C.H.,
89 S.W.3d at 26.  But because the K.C.M. court found the
evidence did not meet the lower standard it applied, it surely would have found
it insufficient under the current standard.





[13]  Compare
Wetzel v. Wetzel, 715 S.W.2d 387, 390 (Tex. App.CDallas 1986, no writ) (reversing termination when
evidence showed mental illness had been cured) with Carter v. Dallas County
Child Welfare Unit, 532 S.W.2d 140 (Tex. Civ.
App.CDallas 1975, no writ) (affirming termination when
evidence showed mental illness would never be completely cured).





[14]  See Johnson
v. Jefferson County Child Welfare Unit, 557 S.W.2d 569, 570 (Tex. Civ. App.CBeaumont 1977, no writ) (reversing termination based
solely on single scalding incident three years before trial); see also
Hendricks v. Curry, 401 S.W.2d 796, 802 (Tex. 1966) (finding relinquishment
of parental rights that was later revoked insufficient to support termination).





[15]  See
In re J.F.C., 96 S.W.3d at 272 (holding parents=
extensive history of substance abuse and violence was not rendered legally insufficient
by improvements that appeared to render their home safe and loving five months
before trial).





[16]  See id. at
277B78; In re J.I.T.P., 99 S.W.3d 841, 848 (Tex.
App.CHouston [14th Dist.] 2003, no pet.)  (affirming termination despite belated
parental attempts to better their domestic violence and parenting abilities).





[17]  See also In
re C.T.E., 95 S.W.3d 462, 466 (Tex. App.CHouston
[1st Dist.] 2002, no pet.) (reversing best-interest finding in favor of
termination for factual insufficiency based on father=s progress, classes he took, and no evidence that his
recent criminal history included narcotics).





[18]  See
Tex. Fam. Code '
162.001(b).





[19]  See
Tex. Fam. Code '
153.371. 





[20]  See, e.g.,
Matthews v. Simmons, 589 S.W.2d 156, 159 (Tex. Civ.
App.CTyler 1979, no writ) (reversing trial court order
granting termination that also gave terminated parent visitation rights); Johnson
v. Jefferson County Child Welfare Unit, 557 S.W.2d at 571(same).





[21]  See In re
U.P., No. 14‑02‑00126‑CV, 2003 WL 152346, at *7 (Tex.
App.CHouston [14th Dist.] Jan. 23, 2003, no pet. h.); In
re T.M., 33 S.W.3d 341, 346 (Tex. App.CAmarillo
2000, no pet.).





[22]  See
Tex. Fam. Code
' 263.401
(providing also for one six-month extension).





[23]  See In re
T.M., 33 S.W.3d at 346;  In re Bishop,
8 S.W.3d 412, 416B17 (Tex. App.CWaco
1999, no pet.).





[24]  See
Tex. Fam. Code
'' 263.405(d),
(e). Two sections enumerated A263.405" were added by the 77th legislature, one
under chapter 809, one under chapter 1090. 
For purposes of this appeal, reference to section 263.405 is to the
section added under Acts 2001, 77th Leg., ch. 1090 ' 9, entitled, AAppeal
of Final Order.@





[25]  See
State v. Roland, 973 S.W.2d 665, 666 (Tex. 1998).  





[26]  In
re D.R.L.M., 84 S.W.3d 281, 290 (Tex. App.CFort
Worth 2002, pet. denied).  





[27]  See
In re J.W., 52 S.W.3d 730, 732 (Tex. 2001).  





[28]  See
Tex. Fam. Code  '
263.405(e).  Clearly, the trial court did
not lose jurisdiction after the 30th day, as an order denying the indigency motion may be signed through the 36th day.