In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00082-CV


______________________________




ROBERT BOWMAN, BOYD UNIT INMATE, Appellant



V.



SHERI D. HENDRIX, T.D.C.J.,


FOOD SERVICE DIVISION, Appellee



 


On Appeal from the 87th Judicial District Court


Freestone County, Texas


Trial Court No. 07-224-B




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Carter



MEMORANDUM OPINION



 After filing several internal grievances against the cafeteria for the Texas Department of
Criminal Justice's Boyd Unit (located in Teague, Texas), Robert Bowman filed a lawsuit against the
captain of that cafeteria. The suit alleged the Boyd Unit was, among other things, providing
nutritionally insufficient meals for the prison population. On its own motion, the trial court
dismissed Bowman's lawsuit without prejudice because Bowman had failed to include with his
original petition a list of all previous lawsuits he had filed. Bowman now appeals that dismissal. 
We affirm.

 Chapter 14 of the Texas Civil Practice and Remedies Code governs all civil lawsuits (except
for those under the Texas Family Code) brought by Texas inmates in a state district, county, justice
of the peace, or small claims court and in which the inmate files an affidavit or unsworn declaration
of the inability to pay the court costs associated with filing litigation. Tex. Civ. Prac. & Rem. Code
Ann. § 14.002 (Vernon 2002). We review a trial court's dismissal of such a lawsuit (filed pursuant
to Chapter 14 of the Texas Civil Practice and Remedies Code) under an abuse of discretion standard. 
Clark v. Unit, 23 S.W.3d 420, 421 (Tex. App.--Houston [1st Dist.] 2000, pet. denied). A trial court
abuses its discretion when its decision is outside the zone of reasonable disagreement or when the
court's decision is made without reference to guiding rules or principles. Id.; see also Breckenridge
v. Nationsbank of Tex., N.A., 79 S.W.3d 151, 157 (Tex. App.--Texarkana 2002, pet. denied).

 An inmate who seeks to file a lawsuit without paying the typical filing fees associated with
civil litigation must, in addition to other requirements, file with his or her original petition a
specialized, separate affidavit. This affidavit must identify each lawsuit, "other than a suit under the
Family Code, previously brought by the person and in which the person was not represented by an
attorney, without regard to whether the person was an inmate at the time the suit was brought . . . ." 
Tex. Civ. Prac. & Rem. Code Ann. § 14.004(a)(1) (Vernon 2002). This affidavit must further
describe each of the listed suits by:

 (A) stating the operative facts for which relief was sought; 


 (B) listing the case name, cause number, and the court in which the suit
was brought; 


 (C) identifying each party named in the suit; and 


 (D) stating the result of the suit, including whether the suit was dismissed
as frivolous or malicious under Section 13.001 or Section 14.003 or otherwise.


Tex. Civ. Prac. & Rem. Code Ann. § 14.004(2) (Vernon 2002). The purpose of Article 14.004 "is
to curb the constant, often duplicative, inmate litigation, by requiring the inmate to notify the trial
court of previous litigation and the outcome." Clark, 23 S.W.3d at 422.

 A trial court may, on its own motion, dismiss an inmate's civil lawsuit under certain
circumstances. One such instance when sua sponte dismissal is permitted is when the trial court
finds the inmate's current lawsuit "is substantially similar to a previous claim filed by the inmate
because the claim arises from the same operative facts." Tex. Civ. Prac. & Rem. Code Ann.
§ 14.003(b)(4) (Vernon 2002). If an inmate does not file the affidavit with his or her lawsuit (that
affidavit which lists and describes all the inmate's previous litigation) or if that affidavit is
incomplete, then a trial court is entitled to assume the current lawsuit is substantially similar to one
previously filed by the inmate and, therefore, frivolous. Bell v. Tex. Dep't of Criminal Justice-Institutional Div., 962 S.W.2d 156, 158 (Tex. App.--Houston [14th Dist.] 1998, pet. denied).

 In this case, Bowman did not file the affidavit required by Article 14.004 of the Texas Civil
Practice and Remedies Code. He states in his appellate brief that he did not file the affidavit because
he had never previously filed any lawsuits. Such evidence is, however, outside the record. We are
limited to the appellate record before us. Facts that are outside the official record cannot be made
part of the record. Merch. Ctr., Inc. v. WNS, Inc., 85 S.W.3d 389, 394 (Tex. App.--Texarkana 2002,
no pet.). If Bowman had not previously filed any lawsuits, he must nevertheless file an affidavit
stating such because the affidavit is mandatory under Chapter 14 of the Texas Civil Practice and
Remedies Code.

 In this case, our law authorized the trial court to presume Bowman's current lawsuit was
substantially similar to one Bowman had previously filed, but which was currently unknown to the
trial court because Bowman had not filed the required affidavit. Further, the trial court was
permitted under our law to assume Bowman's current lawsuit was based on the same operative facts
as that previous litigation and was, therefore, frivolous. Chapter 14 of the Texas Civil Practice and
Remedies Code expressly authorizes a trial court to dismiss such a lawsuit on the court's own
motion. The trial court's decision to dismiss Bowman's lawsuit without prejudice was proper under
our law. No abuse of discretion has been shown.

 We overrule Bowman's sole point of error and affirm the trial court's judgment.




 Jack Carter

 Justice

 

Date Submitted: August 13, 2007

Date Decided: August 22, 2007



nterest in a final decision on termination so that adoption to a stable home or return to the parents
is not unduly prolonged. M.S., 2003 WL 21512654, at *12.
            The standard for our review in determining whether clear and convincing evidence has been
provided to justify termination is whether the evidence is such that a fact-finder could reasonably
form  a  firm  belief  or  conviction  that  the  State's  allegations  were  true.  See  Tex.  Fam.  Code
Ann. § 101.007 (Vernon 2002); C.H., 89 S.W.3d at 25 ("'Clear and convincing evidence' means the
measure or degree of proof that will produce in the mind of the trier of fact a firm belief or
conviction as to the truth of the allegations sought to be established."). The Texas Supreme Court
reasoned in C.H. that this provides a standard that "focuses on whether a reasonable jury could form
a firm conviction or belief [yet] retains the deference an appellate court must have for the fact
finder's role." C.H., 89 S.W.3d at 26. In reaching this conclusion, the court explicitly rejected
standards "that retain the traditional factual sufficiency standard while attempting to accommodate
the clear-and-convincing burden of proof." Id.; see, e.g., In re W.C., 56 S.W.3d 863, 868 n.3 (Tex.
App.‒Houston [14th Dist.] 2001, no pet.); Leal v. Tex. Dep't of Protective & Regulatory Servs., 25
S.W.3d 315, 321 (Tex. App.‒Austin 2000, no pet.). The court also disapproved of a test articulated
in several cases which stated that a court of appeals must determine whether a reasonable trier of fact
could conclude that the existence of a disputed fact is "highly probable." C.H., 89 S.W.3d at 26. 
Under such review, we must maintain the respective constitutional roles of juries and appellate
courts.
An appellate court's review must not be so rigorous that the only fact-findings that
could withstand review are those established beyond a reasonable doubt. See
Santosky, 455 U.S. at 767-69 (holding that "beyond reasonable doubt" standard not
required in termination cases). While parental rights are of constitutional magnitude,
they are not absolute. Just as it is imperative for courts to recognize the
constitutional underpinnings of the parent-child relationship, it is also essential that
emotional and physical interests of the child not be sacrificed merely to preserve that
right.

Id.
            The nonexclusive list of factors we may consider in determining whether the termination of
a parent's rights is in a child's best interest includes (1) the desires of the child, (2) the emotional and
physical needs of the child now and in the future, (3) the emotional and physical danger to the child
now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs
available to assist these individuals to promote the best interest of the child, (6) the plans for the
child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed
placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child
relationship is not proper, and (9) any excuse for the acts or omissions of the parent. Holley v.
Adams, 544 S.W.2d 367, 371-72 (Tex. 1976); In re C.T.E., 95 S.W.3d 462 (Tex. App.‒Houston [1st
Dist.] 2002, pet. denied).
 
 
The Evidence
            In this case, there was no evidence the children had expressed a preference regarding whether
to live with Tanya. The evidence reflects there are emotional and physical needs of the children for
both short- and long-term stability and care-giving which were not met in the living environment
provided by Tanya. In her testimony, Tanya admits that she and her husband, Edward Trevino
(Trevino)


 used and sold cocaine and methamphetamine; that they had left the children, effectively,
to fend for themselves for several days at a time; and that she had continued to live with a husband
who was an alcohol and drug abuser, and who physically abused both Tanya and at least the oldest
of the children. The evidence shows a lack of parental ability stretching over the lifetimes of the
children, and an unwillingness for that entire time (except possibly for the last few months) to make
any changes that would improve the situation. Plans had been put in place to assist, and programs
were made available, but the testimony was that Tanya failed to take advantage of them. Evidence
was introduced that Tanya was unable or unwilling to provide a stable home or placement and that
the children markedly improved when removed from her care and placed in foster care. It also
showed the Trevino home was unsafe and unsanitary, with transients roaming the house, food left
to rot on counters, drug use and sales, and Tanya and Trevino being in self-induced alcohol or drug
stupors for extended periods of time with small children present. The only excuse suggested by
Tanya was that she was forced into her lifestyle by Trevino. There is evidence he was physically
abusive, but the evidence also shows she made no effort to avoid the situation by taking any
affirmative action. She also testified that he had injected her with drugs and that she retrieved drugs
for him because she was afraid of him. Tanya no longer lives with Trevino (who is incarcerated),
but has moved in with her mother and has been joined there by a new boyfriend. The State's drug
screening showed she had been drug free since July 2002.
            The State's evidence certainly painted an appalling picture of Tanya's home situation, both
when she and the children lived with Trevino and currently. Scott Toliver, the Family Based Safety
Services Specialist who had worked with the Trevino family since April 2002, testified Tanya spent
a significant amount of time away from home working, leaving Trevino with the children.


 Trevino
has cirrhosis of the liver, but continued to drink alcohol in large quantities, and Toliver testified that,
as Trevino lowered his alcohol intake, he shifted to use of cocaine and methamphetamine. Toliver
testified that, when he visited the home, he found it typically inundated with dirty dishes, food
apparently left out for days at a time, clothes, beer bottles, and cans covering the floor, cockroaches
infesting it, and numerous safety hazards such as broken windows.
            Toliver also testified neither Tanya nor Trevino were making any effort to comply with the
service plans set up by the department. He also testified he had seen bruises on Tanya from attacks
by Trevino. Toliver noted that he had found a prostitute at the home during one of his visits and that
transients and multitudes of friends and acquaintances would come and go there.
            At one point, on June 10, 2002, Tanya came to Toliver asking for help because she and
Trevino had been injecting methamphetamine and cocaine for several days, and the children had
eaten only two meals in two days. She also told Toliver that Trevino was coercing her to sell drugs
for him and became angry and violent when she could not sell them. 
            At that point, Toliver and police officers removed the children from the house. They found
Trevino with track marks on his arms and found a sawed-off shotgun in the house.


 Toliver
described all three children as being very dirty, with the two youngest wearing only underwear. At
that point, all three children were placed in foster care. 
            A new family service plan was then designed for Tanya, which required her to undergo drug
assessments and treatment, to take parenting classes and an education course on choices and
consequences, to establish and keep a home for two months before any return of a child, and to
budget adequately to maintain the home she established. CPS began providing services in October
2000 and took the position that Tanya had failed for almost two years thereafter to demonstrate either
desire or willingness to protect her children. Toliver also testified Tanya had not shown any
cooperation or made any attempt to improve her parenting skills for the two years before the children
were removed.
            Robert Shore, a psychologist, testified at length about the evaluations done on each of the
children. He testified that R.I.S., the oldest boy, had auditory hallucinations, which was extremely
unusual for a child. Shore discussed the history of domestic violence by Trevino toward both Tanya
and the children, the parents' use of significant quantities of drugs in the presence of the children,
the children going without food, and the total lack of structure and stability in the household. He
testified that household structure and stability were critical to help a child develop the resources for
self-control, that lack of these factors in the household would cause the child to get highly anxious
and to develop behavior problems, emotional disturbances, and the like, and that this would also
factor into R.I.S.'s aggressive behavior toward his siblings. There is also testimony from Tieraney
Beall, a CPS worker with these children, that since R.I.S. has been in foster care his behavior has
improved, that he no longer soils his pants and hides them, that the medication he is taking helps
control his aggressive behavior and anger, and that he is making good grades in regular classes at
school. 
            Shore testified that E.T., Jr., a boy just short of five years of age at the time he was evaluated,
was developmentally behind and that he was wetting his pants and soiling himself during the day,
a sign of anxiety in children who have lived in chaos. He testified E.T., Jr., while in foster care, was
happy when there was plenty to eat (another sign of prior neglect), fought other children, and was
uncontrolled in his behavior. Shore also testified E.T., Jr., exhibited compulsive sexual behavior,
resulting from the environment from which he came, and that in a less chaotic environment, therapy
would help him develop more self-control. 
            Shore testified that D.C.T., the youngest boy, who was just under four years of age at the time
he was evaluated, was in a little better shape because of his young age, but that when he entered
foster care he was stuttering badly, a sign of anxiety–as shown by the fact his stuttering had abated
after three months in foster care. He also testified D.C.T. was highly resistant to going to bed at a
particular time, showing the previous lack of structure in the home and D.C.T.'s resulting perception
of danger and lack of predictability. As described by the psychologist,
[T]hat's how they learn safety. They learn to be safe. If they can predict what's going
to happen in their environment, it's okay to live here; it's safe to be here. I feel safe.
I don't have to be anxious, then. I know what's going to happen. I know I'm going
to get meals. I know Mommy and Daddy aren't going to be beating each other up.
I know there's not all these weird characters coming in and out of the house, and on
and on.
            Shore also testified he believed it was important for these children to have permanence away
from their parents and pointed out on cross-examination that the fact the children had bonded to their
parents did not mean those individuals should continue to parent.
            Tanya has not attempted to dispute any of the testimony about her past activities and failures
to address problems in the household. She instead focuses her arguments on personal injuries she
sustained during the current service plan. Tanya argues the State had not done all it could to reunite
the family because it had terminated her rights while she was unable to work due to her broken legs
and was living with her mother, and thus was unable to afford the psychological evaluation or
counseling. The evidence shows that she was hit by a car on August 20, 2002, and that the accident
broke both her legs and left her unable to actively participate in services. The evidence shows Tanya
(1) completed her parenting classes and East Texas Council on Alcoholism and Drug Abuse,
(2) passed drug screening since July 2002, and (3) attended visitations. The State had required
psychological evaluations and counseling services, but had declined to pay for them. Because of her
inability to walk, however, Tanya was unable to work, and there is some evidence she was therefore
unable to afford the services. It is not clear from the evidence what occurred after her legs healed,
or the full extent of the damage done in the accident. Eight months elapsed between the date of the
accident and the hearing, but it does not appear Tanya had made any continuing effort to get the
counseling or psychological services during that time. There is also testimony Tanya had been given
the name of a psychological service that charged only according to ability to pay. 
            There is also testimony Tanya had not been up to date with the service plan before the
accident, but had been able to complete some of it since the accident. At the time of the hearing, she
was living with her mother, and a boyfriend had also moved in with them. Bertile Johnson, a family
worker for CPS, testified Johnson had visited that home and found it to be an environment that was
neither safe nor sanitary for children. Photographs were introduced into evidence showing the
interior of the house with trash piled against the walls, open food containers crowding every square
inch of counter and table space, and floors covered with various types of debris. Johnson likewise
concluded there was no demonstrated significant change that would permit either the father or
mother to effectively parent their children.
 
Similar Cases
            The question before this Court is whether the evidence, as set out above, was such as to allow
the trial court as fact-finder to reasonably form a firm belief or conviction about the truth of the
State's allegations. Counsel has directed us to two cases in which appellate courts, on analogous
facts, concluded that the evidence in those cases did not support termination.
            In re K.C.M., 4 S.W.3d 392 (Tex. App.‒Houston [1st Dist.] 1999, pet. denied), involved a
mother who had a long history of drug abuse, prostitution, and an exhibited unwillingness to care
for her young son. When she was sent to jail, however, she began a change that the appellate court
found compelling. The opinion lists nine activities in which she had engaged while in jail, over a
period of ten months, that the court concluded showed her desire to change her life upon release. 
Id. at 399. In light of the uncontroverted evidence of the progress she had made while in jail, that
court concluded that a "firm belief or conviction" that the best interest of the child required
termination could not be fairly reached.
            C.H., 89 S.W.3d 17 (Tex. 2002), reversing, 25 S.W.3d 38 (Tex. App.‒El Paso 2000),
contains the Texas Supreme Court's explanation of the standard that should be employed by appellate
courts in reviewing evidentiary sufficiency in parental rights termination proceedings. The El Paso
Court of Appeals had found the evidence insufficient to support a finding that termination was in the
child's best interest. The Texas Supreme Court reversed the El Paso court because the El Paso court
disregarded much of the evidence supporting the finding that termination was in the child's best
interest (mainly involving the father's past neglect and his failures to effectively parent either that
child or an older one by his wife) and because the court of appeals failed to explain clearly why it
concluded a reasonable fact-finder could not form a "firm conviction or belief from all the evidence"
that termination of the father's rights was in the child's best interest. Id. at 29.



Conclusion
            In this case, we begin with the underpinning of past behavior by Tanya that shows, that for
several years, despite the State's attempts to intervene, she did not develop or show the desire to act
as a parent for the children. The evidence is, in fact, to the contrary. It appears the destructive
activities accelerated as time went on, reaching their worst with a multi-day cocaine binge–with the
three children in the house.
            We recognize Tanya's efforts to get the children out of the house and to seek help at that
point, weigh in her favor. Her belated, but ultimately successful, attempt to complete parenting
classes, and the evidence that she did stay drug free from July 2002 until April 2003, also weigh in
her favor.
            Against this, however, lies the extensive evidence of her past activities and her failure to
attempt to meet the remaining requirements of psychological therapy and counseling, despite being
informed of how she might do so. Into this we insert her injuries from a car accident–injuries
occurring eight months before the trial court's hearing. The condition of her current residence into
which the children would be placed also weighs against Tanya, because of the squalor and lack of
structure in that house.
            There is evidence on both sides of this issue. The question is whether, from all of the
evidence, the trial court as fact-finder could reasonably form a firm belief or conviction about the
truth of the State's allegations. Based on Tanya's history, her only partial compliance with the service
plans, the condition of the children at the time they were taken into foster care, their very substantial
improvements in all areas since being removed, and Tanya's subsequent home situation, we must
conclude that the trial court in this situation could reasonably form the required firm belief or
conviction about the truth of the State's allegations and that it was therefore in the best interests of
the children to terminate Tanya's parental rights.
            We affirm the judgment.
 
                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice

Date Submitted:          October 20, 2003
Date Decided:             October 30, 2003