Opinion issued January 27, 2005



 
 

 

              
 
 
 
In The
Court of Appeals
For The 
First District of Texas
 

 
 
NO. 01-04-00221-CV
 

 
 
KEITH AND KARLA WHITE, Appellants
 
V.
 
TEXAS DEPARTMENT OF FAMILY & PROTECTIVE SERVICES,
Appellee
 

 
 
On Appeal from the 306th District Court
Galveston County, Texas
Trial Court Cause No. 02CP0108
 

 
 
MEMORANDUM OPINION
          Appellants, Keith and Karla White, appeal the trial court’s judgment
terminating the parent-child relationships between them and their two children,
Girl and Boy. We determine (1) whether the evidence at trial was legally and
factually insufficient; (2) whether appellants properly preserved their point of error
asserting their right to have the jury hear questions regarding conservatorship when
the original petition requested conservatorship and termination of parental rights;
and (3) whether the trial court erred by denying appellants’ motion to strike
testimony of a rebuttal witness. We affirm.
Background
          Keith married Karla in San Diego, California in August 2000. On October
10, 2001, Karla gave birth to a daughter, Girl, who was born with intestines outside
her body. Girl’s condition required numerous surgeries. Keith and Karla had to
learn how properly to mix the vitamins and nutrients that Girl received through an
intravenous line to her heart and a gastrostomy tube to her stomach. 
          At the end of July 2002, Keith, Karla, and Girl went to Galveston to take an
extended vacation and to attend the wedding of Keith’s sister, Dotria Biggers. 
During their time in Galveston, appellants stayed with Keith’s mother, Pinky
Rowe. They did not take Girl to a doctor for weekly checkups, as had been done
in California, and the first time that Girl went to see a doctor in Texas was on
September 19, 2002, when she had a fever. 
          On October 28, 2002, Karla White gave birth to a son, Boy, in the bathroom
of Pinky’s home, and Boy was taken to a hospital shortly thereafter. Keith and
Pinky were not aware that Karla had been pregnant. After Boy’s birth, Keith and
Karla left Pinky’s home because they were no longer welcome to stay. 
          On October 31, 2002, the Texas Department of Family and Protective
Services (DFPS) took both Girl and Boy into custody after a complaint that
appellants were homeless. On December 23, 2002, both children moved to Pinky’s
home, where Girl still resides. On March 19, 2003, Boy moved to a foster home,
where he still resides. After a jury trial on January 15, 2004, the court terminated
Keith’s and Karla’s parental rights to both Girl and Boy. Keith and Karla now
appeal that judgment.Legal and Factual Sufficiency of EvidenceIn their first and second points of error, appellants contend that the evidence
was legally and factually insufficient to terminate parental rights to their children,
Girl and Boy. Specifically, Keith contends that the evidence was legally and
factually insufficient to prove by clear and convincing evidence that termination
was in the best interests of both children and that he committed one of the six
alleged grounds for termination.



          Karla White contends that the evidence was legally and factually insufficient
to prove by clear and convincing evidence that termination was in the best interests
of the children and that she committed one of the first five grounds of termination.


 
A.     Standards of Review 
          In termination-of-parental-rights cases, “Due Process requires that the state
support its allegations [of termination] by at least clear and convincing evidence”
in order to reduce the risk of erroneous termination. Santosky v. Kramer, 455 U.S.
745, 747-48, 102 S. Ct. 1388, 1392 (1982); In re B.L.D. & B.R.D., 113 S.W.3d 340,
353-54 (Tex. 2003). “Clear and convincing evidence” is defined as that measure
or degree of proof that will produce in the mind of the trier of fact a firm belief or
conviction as to the truth of the allegations sought to be established. Harris v.
Herbers, 838 S.W.2d 938, 941 (Tex. App.—Houston [1st Dist.] 1992, no writ).
          1.       Legal Sufficiency
          When an appellant attacks the legal sufficiency of an adverse judgment on
an issue on which he did not have the burden of proof, the appellant must
demonstrate that there is no evidence to support the adverse finding. Tex. R. App.
P. 38.1(e); Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983). The standard
on appellate review for legal sufficiency in termination-of-parental-rights cases is
whether the evidence is such that a fact finder could reasonably formed a firm
belief or conviction about the truth of the matter on which the State bore the burden
of proof. In re J.F.C, 96 S.W.3d 256, 266 (Tex. 2002). In reviewing a no-evidence
claim, we consider the evidence in the light most favorable to the verdict, assume
that the fact finder resolved disputed facts in favor of its finding if a reasonable fact
finder could have done so, and disregard all contrary evidence that a reasonable
fact finder could have disbelieved or found to be incredible. Id.; In re
Guardianship of Hinrichsen, 99 S.W.3d 773, 781 (Tex. App.—Houston [1st Dist.]
2003, no pet.).2.Factual Sufficiency 
          When an appellant attacks the factual sufficiency of an adverse finding on
an issue on which the opposing party had the burden of proof, the appellant must
demonstrate that there is insufficient evidence to support the adverse finding. 
Croucher, 660 S.W.2d at 58. The standard of review for a factually-insufficient-evidence challenge is whether the evidence is such that a fact finder reasonably
could have formed a firm belief or conviction about the truth of the State’s
allegations. In re C.H., 89 S.W.3d 17, 25 (Tex. 2002). In analyzing factual
sufficiency, we consider whether the disputed evidence is such that a reasonable
fact finder could not have resolved that disputed evidence in favor of its finding. 
In re J.F.C., 96 S.W.3d at 265. A factual-sufficiency challenge will be overruled
if, considering all of the evidence in the record, both that which supports and that
which contradicts the trial court’s finding, the jury reasonably could have formed
a firm conviction or belief that the parents committed one of the six alleged
grounds of termination and that the termination of parental rights is in the best
interest of both children. In re C.H., 89 S.W.3d at 29. 
B.     The Law
          The separate grounds for termination are listed in the Texas Family Code,
joined with the disjunctive term “or”; thus, a court may base a termination of
parental rights upon a finding that a parent engaged in conduct described in any
one of the alleged grounds, such as constructive abandonment, plus a finding that
termination is in the best interest of the children. See Tex. Fam. Code Ann. §
161.001 (Vernon 2002); In re L.M., 104 S.W.3d 642, 647 (Tex. App.—Houston
[1st Dist.] 2003, no pet.). 
          1.       Constructive Abandonment
          Constructive abandonment is one of the grounds in section 161.001 of the
Family Code on which termination of parental rights may be based. See Tex. Fam.
Code Ann. §161.001(N). In order to prove constructive abandonment, DFPS must
prove that it had a permanent or temporary managing conservatorship of the
children for at least six months. Id. Additionally, DFPS must show that it made
reasonable efforts to return the children to the parents, that the parents did not
regularly visit or maintain significant contact with the children, and that the parents
demonstrated an inability to provide the children with a safe environment. See id. The jury could have reasonably formed a firm belief or conviction based on
clear and convincing evidence that appellants constructively abandoned Girl and
Boy. Because it is undisputed that DFPS had been the temporary managing
conservator of Girl and Boy for well over the six months required under the
constructive-abandonment section, we need analyze only the remaining statutory
requirements: (1) whether DFPS made reasonable efforts to return the children to
appellants, (2) whether appellants did not regularly visit or maintain significant
contact with the children; and (3) whether appellants demonstrated an inability to
provide the children with a safe environment. See Tex. Fam. Code Ann. §
161.001 (Vernon 2002). If no evidence exists for one or more of the above-mentioned elements, then the implied finding of constructive abandonment fails. 
In re D.T., 34 S.W.3d 625, 633 (Tex. App.—Fort Worth 2000, pet. denied); see
also In re H.R., 87 S.W.3d 691, 699 (Tex. App.—San Antonio 2002, no pet.).
                    a.       Reasonable Efforts to Return the Children
          On November 18, 2002, appellants were present at a DFPS mediation when
the Family Service Plan, in which appellants agreed to complete certain
requirements in order to get their children back, was drafted. These requirements
included providing necessities for the children and completing psychological
testing, drug and alcohol evaluations, and parenting assessments. In order to help
appellants’ family reach the goal of reunification, DFPS authorized free services
and even extended the free services authorization after Keith had failed to take
advantage of some of them. Child Protective Services (CPS) worker Jennifer
Jackson testified that she had tried to communicate with appellants, but had
difficulty doing so since February 2003 because either the telephone numbers that
she had did not work, or because she left messages that appellants did not return. 
Furthermore, Jackson testified that she visited Keith’s mother’s house and Karla’s
place of work to leave messages for appellants, but that she still lacked any
significant contact with them. Jackson also testified that DFPS changed its goal
from family reunification to termination of parental rights on March 17, 2003, at
a hearing for which appellants failed to appear. However, Jackson testified that,
if she had been able to contact appellants, she would have helped to facilitate any
of appellants’ needs in accomplishing reunification, even after the goal changed
from reunification to termination of parental rights. Viewing this evidence in the
light most favorable to the verdict, we hold that the evidence was such that the jury
reasonably could have formed a firm belief or conviction that DFPS made
reasonable efforts to return the children to appellants. See In re J.F.C., 96 S.W.3d
at 266-67.
          Appellants contend that the evidence was factually insufficient to show that
DFPS made reasonable efforts to return the children because they had lived in their
own apartment from January 2003 until June 2003 and no one from CPS ever came
to the apartment to inspect it. Keith testified that he had tried to call CPS more
than a hundred times, but got no response. Karla also testified that CPS had her
cell phone number and her work telephone number, but that CPS never called her
or left any messages.
          However, Jackson testified that the telephone numbers she had for appellants
either did not work or, when they did, she left messages that appellants did not
return. Jackson further testified that she was never given a specific address at
which to reach appellants. Jackson testified that she knew that appellants had lived
in several locations and that the most specific information that she had about their
whereabouts at any particular time was the “cross streets” on which they lived. As
a result, a reasonable jury could have formed a firm belief or conviction that
reasonable efforts were made to return the children. Id. at 264.b.Regular Visits or Maintaining Significant Contact with the
Children
 
          As a part of the Family Service Plan, appellants agreed to visit Girl and Boy
regularly, and the court order, which formalized the Family Service Plan, specified
that they could visit their children once a month at the CPS office and could
additionally visit for any amount of time that had been mutually agreed on with the
relative with whom the children were placed. CPS initially attempted to place both
children with relatives to facilitate more frequent contact. Appellants did have
contact with the children after they were first taken away; however, Keith’s visits
became less frequent by December 2002, and, after February 2003, both he and
Karla completely stopped visiting the children at his mother’s home. Moreover,
appellants failed to show up at the CPS visits scheduled in April and May of 2003 
and did not visit their children in June or July of 2003. Appellants did visit the
children in early August 2003, but, during their only September 2003 visit with the
children at the CPS office, appellants left one hour early. Moreover, appellants
were aware that Girl was in the hospital for a few days in September, but they
never visited her. Appellants visited their children three times in October 2003, but
not in November 2003. They also left the December 23, 2003 visit with the
children 45 minutes early. In total, during the 10-month period preceding trial,
during which time appellants had failed to visit their children at Pinky’s home due
to alleged prohibition by the children’s custodian, appellants had visited the
children only six times at the CPS arranged meetings, twice leaving early. Viewing
the evidence in the light most favorable to the verdict, we hold that the jury
reasonably could have formed a belief that appellants did not regularly visit or
maintain contact with the children. The minimal number of visits that appellants
made to the children is legally sufficient for the finding of termination of parental
rights. See In re B.S.T., 977 S.W.2d 481, 486 (Tex. App.—Houston [14th Dist.]
1998, no pet.). 
          Appellants assert that the evidence is factually insufficient to show that they
did not maintain regular or significant contact with the children. Keith testified
that they had seen the children on almost a daily basis when they were placed with
Keith’s aunt, Joy Turner, a religious minister. This placement lasted for two weeks
because Turner could not care for the children properly. Keith also testified that
he and Karla continued to have regular visits with the children when they were
placed with his mother until first Keith and then Karla were told not to come to his
mother’s home anymore. Karla also testified that she and Keith had regular visits
with the children and that the visits continued until both appellants were eventually
banned from Keith’s mother’s home.
          However, Karla also testified that there were many times that Keith did not
come with her to visit the children. Furthermore, although Keith asserts that he did
not see his children often because he was not allowed to visit his mother’s home,
his sister, Dotria Biggers, testified that Keith was never barred from his mother’s
home; he was just not allowed to visit without someone else’s being there. Biggers
testified that she did not want Keith to be alone in the house with her because he
had previously slapped her. Karla also testified that she did not visit regularly with
Girl because she was not allowed at Keith’s mother’s home. However, Irma
Francois, Keith’s aunt and a co-worker of Karla’s and Keith’s mother, testified that
Karla was never told that she could not visit Keith’s mother’s home. CPS worker
Jackson also testified that Karla never notified her that she was not allowed to visit
Keith’s mother’s home anymore. Francois and Biggers both testified that they had
notified Karla that Girl was in the hospital for a staph infection in September 2003,
but that appellants did not visit. Biggers further testified that, after March 2003,
Karla saw Girl only by chance, when Biggers or Keith’s mother brought Girl to Dr.
Snyder’s home, where Karla worked. 
          Appellants also assert that any visitations that they missed at the CPS office
were due to CPS’s failure to notify them. As stated previously, both Keith and
Karla testified that they had tried numerous times to contact CPS, but were
unsuccessful. They also testified that CPS did not return their telephone calls or
attempt to contact them, even though CPS had correct telephone numbers.
          Appellants’ testimony is in direct conflict with Jackson’s testimony. Jackson
testified that she tried several times to contact appellants, but that she either was
not given correct numbers or that appellants did not answer the messages that she
left for them. Furthermore, on a few occasions when appellants did show up for
their monthly visitations with the children at the CPS office, appellants left early. 
To summarize, during the 10-month-long period preceding trial, during which time
Pinky allegedly prohibited Keith and Karla from visitation, appellants visited Boy
and Girl only six times at the arranged CPS meetings, twice leaving early. This
minimal number of visits is factually sufficient for an order of termination of
parental rights. Id. at 486. Moreover, the jury could have believed DFPS’s
witnesses that Keith was not banned from Pinky’s home and that the parents
received, but did not return, Jackson’s messages or gave her incorrect telephone
numbers. See Toles v. Toles, 45 S.W.3d 252, 259 (Tex. App.—Dallas 2001, pet.
denied). 
          Considering all of the evidence in the record concerning appellants’ contact
with the children, the jury reasonably could have formed a firm conviction or belief
that they lacked regular visitation or significant contact with the children. In the
Interest of J.F.C., 96 S.W.3d at 264.
                    c.       Inability to Provide a Safe Environment
          DFPS was also required to prove that appellants failed to provide a safe
environment for the children.
          The testimony revealed that Keith and Karla were living with friends at the
time of trial whom they had known for a very short period of time and that they had
moved several times since July 2002. Furthermore, Karla testified that she did not
recall with whom she and Keith had lived prior to moving into their apartment. 
She further testified that they had lived in a hotel for two months after having lived
with Tracy Glenn for five months. Karla testified that she and Keith knew Glenn
for a month before they moved in with her. In addition, Terry Lopez, the tenant
who had invited appellants to live with him just prior to trial, testified that he was
currently supporting Keith and Karla financially. Lopez also testified that he had
been on probation for burglary and that he had recently been arrested for making
terroristic threats. When viewing the evidence in a light most favorable to the
verdict, the jury reasonably could have found that appellants were unable to
provide the children with a safe environment. 
          Appellants contend that the evidence was factually insufficient to show that
they failed to provide a safe environment because DFPS did not show that the
homes in which appellants lived were unsafe.
          However, Karla’s testimony established that appellants had moved
frequently enough that it was difficult for her to even recall the places that and
people with whom they had lived since they had moved to Texas. Jackson testified
that while she was working appellant’s case for CPS, she was unable to contact
appellants and could determine, at most, only the cross streets on which appellants
lived at various times. In addition, Lopez, the person with whom appellants lived
at the time of trial, testified that he had recently been arrested for making terroristic
threats. Thus, combining all of the evidence in the record, we hold that the jury
reasonably could have formed a firm belief or conviction that appellants were
unable to provide a safe environment for the children. Id. 2.Best Interest of the Children
          In order to show that appellants’ parental rights should be terminated, DFPS
was also required to prove by clear and convincing evidence that termination was
in the best interest of the children. See Tex. Fam. Code Ann. §161.001(2).
          In determining whether termination is in the children’s best interest, we may
consider several factors, including, but not limited to, (a) the children’s desires, (b)
the children’s emotional, (c) childrent’s physical needs, (d) the possibility of
emotional and physical danger to the children, (e) the acts or omissions indicating
an improper parent-child relationship, (f) the parental abilities of the individuals
seeking custody or the agency seeking custody, (g) plans for the children by the
individuals or agency seeking custody, and (h) the stability of the home or
proposed placement. Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976); In
re L.M., 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). The
burden is on DFPS to rebut the presumption that the best interest of the children
is served by keeping custody in the natural parents. In re K.C.M., 4 S.W.3d 392,
395 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). 
                    a.       Children’s Desires
          The record does not show the children’s desires, likely because of their
tender ages. 
                    b.       Children’s Emotional Needs
          The record does not show the children’s emotional needs, other than to show
that Girl had become very attached to Keith’s mother and called her “Mama.”
                    c.       Children’s Physical Needs
          Appellants argue that they have always had a stable home and that they have
shown their abilities to care for their children by taking care of Girl’s very special
medical needs while she was living with appellants.
          However, appellants admitted that, when they left California, they were
supposed to locate doctors to continue caring for Girl’s special needs. Although
Girl had had frequent doctor’s visits in California due to the serious nature of her
health problems, appellants waited almost two months before taking her to see a
doctor in Texas, and that was for a fever. DFPS correctly notes that failure to
provide medical care, alone, has been found to support termination of the parent
child relationship. See In the Interest of S.H.A., 728 S.W.2d 73, 87 (Tex.
App.—Dallas 1987, ref’d n.r.e.). Moreover, inability or failure to provide medical
attention to the child, much like food deprivation, could sustain a charge of
parental neglect. Mitchell v. Davis, 205 S.W.2d 812-14 (Tex. Civ. App.—Dallas
1947, writ ref’d). 
                    d.       Possibility of Emotional and Physical Danger
          As discussed previously, Girl is a special-needs child to whom appellants
gave high-level care in California, but not in Texas. California doctors advised
appellants to check with doctors in Galveston, but appellants did not follow this
recommendation. In fact, appellants did not take Girl to see a doctor in Texas until
she developed a fever in September, approximately two months after their arrival
to Galveston. On Keith’s mother’s recommendation, Karla accompanied Girl and
her mother-in-law to the hospital. No pre-natal care was given to Boy. In fact, the
record shows that Keith was unaware of Karla’s pregnancy with Boy, and Boy was
born in the bathroom of Keith’s mother’s house. Such failure to provide medical
attention to the children could sustain a charge of parental neglect. See id.
          Keith testified that he was developing a career as a singer. This job
consisted mostly of going to private residences where persons frequently smoked
marihuana. Although Keith claimed that he had never used marihuana, he failed
a drug test which indicated a significant amount of marihuana in his system that
could not be attributable to second-hand smoke. 
          Moreover, the evidence is uncontroverted that appellants have not settled
into a stable home since DFPS took temporary custody of the children. At the time
of trial, appellants were living with and financially relied upon a person charged
with making terroristic threats. 
                    e.       Acts or Omissions Indicating Improper Parent-Child
Relationship
 
          From the minimal amount of parental visitation by appellants, as discussed
earlier, coupled with lack of receipts of support for their children for some months
during the year preceding trial, the jury reasonably could have concluded that
appellants were unstable and lacked interest in their children. Moreover, these
factors could sustain a charge of parental neglect. See id.
                    f.       Parental Abilities of Appellants and Individuals Seeking
Custody
 
          In its effort to reunify appellants with their children, DFPS suggested that
appellants undergo psychological testing and parenting assessments to ensure that
appellants had the correct skills. Although CPS provided appellants with referrals
to obtain these services, appellants did not take advantage of any of them. 
Furthermore, because Keith tested positive for high levels of marihuana, he was
recommended for family therapy, psychiatric followup, and treatment. Again,
Keith did not comply.
          The parental abilities of the individuals seeking custody of the children are
established in the record. Boy lived with Danna Carr since March of 2003 and Girl
has been living with her paternal grandmother. Danna Carr is a licensed foster
parent through the Homes of St. Mark. The record indicates that Pinky Rowe
initiated medical care for Girl when Girl came down with a fever upon her arrival
to Texas and that Girl calls her “Mama.” The record also indicates that Boy’s
interest is important to Danna Carr, because she made an effort to provide Boy with
a family, to allow Boy to grow up knowing his sister and his biological relatives,
like Pinky and Dottie, and even to spend Christmas together with Boy’s relatives
as a family. Carr testified that she loves Boy. 
                    h.       Stability of the Home or Proposed Placement
          The uncontroverted evidence shows that appellants have not settled into a
stable home since DFPS took temporary custody of the children. Appellants stayed
rent-free with some acquaintances and, also, at a hotel in Galveston. Keith
admitted that he had no plans for supporting his family when they moved to
Galveston because he had a lot of family there. Appellants testified that Keith had
devoted most of his time to developing a ministry, from which he had not been able
to provide any kind of steady income, despite spending years working on the
ministry. In addition, Keith testified that he had spent a considerable amount of
time trying to develop a career in the music business, but that effort consisted
mostly of going to private residences and being around persons who frequently
smoked marihuana. Keith testified that he had never used marihuana, although he
failed a drug test, which indicated that he had a significant amount of marihuana
in his system that could not be attributable to second-hand smoke. 
          The jury reasonably could have concluded that appellants were unable to
provide stability for their children’s lives, which has been found to be of paramount
importance in a child’s emotional and physical well-being. See Hann v. Texas
Dept. of Protective and Family Serv., 969 S.W.2d 77, 83 (Tex. App.—El Paso
1998, pet. denied). 
          On the other hand, the record shows that Girl has settled into a stable home
of her paternal grandmother, Pinky Rowe. Pinky opened her home to Girl and her
parents when appellants decided to move to Texas from California. Also, Pinky
initiated the much needed medical care for Girl when Girl developed fever a few
months after appellants’ arrival in Texas. 
          Danna Carr is Boy’s foster parent. Boy resided with his ‘foster mother’ since
March 20, 2003. It is undisputed that Danna believes that it is important for Boy
to know his sister, and has gone to great lengths to develop a family relationship
with Pinky Rowe and Dottie. In fact, all five - Dottie, Pinky, Girl, Boy and Danna
- have spent Christmas together. 
          The jury reasonably could have concluded that Boy and Girl’s new ‘family’
provides stability to the children’s upbringing. 
                    i. Programs Available to Assist Individuals Seeking Custody to
Promote the Best Interest of the Children.
 
          The record does not show what programs the CPS made available to Pinky
Rowe and Danna Carr to promote the best interests of the children.
 
                    j. Summary
          Viewing the evidence in the light most favorable to the verdict, we hold that
the jury reasonably could have formed a firm belief that termination of appellants’
parental rights was in the best interest of both children. 
          Appellants also assert factual insufficiency in finding that termination is not
in the best interests of the children because the children have always had shelter,
food, and clothing while they were in appellants’ care. Considering all of the
evidence in the record, we hold that the jury reasonably could nonetheless have
formed a firm belief that termination of Keith and Karla’s parental rights was in the
best interest of both children. See id.; See Maritime Overseas Corp. v. Ellis, 971
S.W.2d 402, 407 (Tex. 1998). 
          We overrule appellants’ first and second points of error.
Charge Error
          In their third point of error, appellants assert that the trial court erred by
denying requested jury questions regarding conservatorship.
          Keith’s counsel requested that the jury be read questions regarding
conservatorship at an informal conference before the trial began. Although
objections at this early stage of the trial would alone be insufficient to preserve the
issue, reurging prior objections during the charge conference would be sufficient
to preserve error for appeal. See Southeastern Pipe Line Co. v. Tichacek, 997
S.W.2d 166, 172-73 (Tex. 1999). Even though the trial court reminded appellants’
attorneys to raise their objections during the charge conference to preserve their
complaints for appeal, appellants failed to object at the charge conference. Thus,
appellants failed to preserve the third point of error for appeal and, therefore, this
point of error was waived. See Tex. R. App. P. 33.1. 
We overrule appellants’ third point of error.
Denial of Motion to Strike Rebuttal Witness’ Testimony
          In their fourth point of error, appellants contend that the trial court erred in
allowing a rebuttal witness to testify to matters that allegedly had not been brought
up previously in trial.
          Rebuttal evidence is evidence given to disprove evidence presented by an
adverse party or evidence that directly answers or disproves the last round of the
adverse party’s evidence. In re J.B., 93 S.W.3d 609, 617-18 (Tex. App.—Waco
2002, pet. denied); Apresa v. Montfort Ins. Co., 932 S.W.2d 246, 251 (Tex.
App.—El Paso 1996, no writ) (quoting Valley Indus., Inc. v. Cook, 767 S.W.2d
458, 462 (Tex. App.—Dallas 1988, writ denied)); accord In re Bledsoe, 41 S.W.3d
807, 813 (Tex. App.—Fort Worth 2001, no pet.). The trial court has sound
discretion to admit evidence that is cumulative, and we review such admission
under an abuse-of-discretion standard. Buzzard v. MAPCO, 499 S.W.2d 352, 356
(Tex. Civ. App.—Amarillo 1973, writ ref’d n.r.e); Apresa, 932 S.W.2d at 249. The
test for abuse of discretion is whether the court acted without reference to any
guiding rules and principles, or whether the act was arbitrary or unreasonable. 
Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985).
          Appellants argue that Yolanda Rowe’s testimony should not have been
admitted because, although she was called as a rebuttal witness, she testified to
several new matters that allegedly had not been brought up by appellants in prior
testimony. Specifically, appellants contend that Rowe’s testimony regarding the
following facts should not have been allowed: (1) Karla’s confession to Rowe
about Keith’s stated intent to kill someone named “Poochy,” (2) Rowe’s witnessing
Karla smoke while she was pregnant, and (3) Keith’s statements regarding trips to
the Hotel Galvez. Appellants argue that these issues were outside the scope of
cross-examination and that the trial court abused its discretion by allowing this
evidence into the record.
          The first issue in question, the rebuttal testimony concerning Keith’s
statement that he planned to kill Poochy, was in direct response to the last round
of Karla’s testimony. Rowe’s testimony rebutted Karla’s testimony that she had
never had a conversation with Rowe. In fact, Karla had specifically testified that
she had never told Rowe that Keith had had a breakdown. Rowe’s testimony that
Karla called her to tell her of Keith’s breakdown and that Keith planned to kill his
friend Poochy directly rebutted Karla’s testimony. With regard to the second issue
in question, Keith testified previously that Karla had never smoked while she was
pregnant. Consequently, Rowe’s testimony that she saw Karla smoking during her
pregnancy rebutted Keith’s testimony. With regard to the third issue in question,
Rowe’s testimony that Keith and Karla would go to the Hotel Galvez and charge
food to other persons’ rooms directly rebuts Keith’s testimony that he had visited
the hotel only as a guest. 
          In all three of the above instances of alleged introduction of new information
on rebuttal, Rowe’s testimony rebutted some evidence already presented by
appellants. As appellants themselves correctly point out, rebuttal evidence is
limited to the purpose of disproving facts already presented into evidence by an
adverse party. Valley Indus., Inc. v. Cook, 767 S.W.2d 458, 462 (Tex.
App.—Dallas 1998, pet denied) (citing Black’s Law Dictionary 1139 (5th ed.
1979). Because Rowe’s testimony rebutted Keith’s and Karla’s previous
testimony, the trial court was within its discretion to admit Rowe’s testimony. In
re J.B., 93 S.W.3d at 617-18; Buzzard, 499 S.W.2d at 356; Apresa, 932 S.W.2d
at 249.
          We overrule appellants’ fourth point of error.Conclusion
 
We affirm the judgment of the trial court. 
 
 
 
                                                              
 
                                                             Tim Taft
                                                             Justice
 
Panel consists of Justices Taft, Jennings, and Hanks.