Affirmed and Memorandum Opinion filed March 30, 2006









Affirmed and Memorandum Opinion filed March 30, 2006.

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-04-01160-CV

____________

 

IN THE INTEREST OF
E.S.C. and L.M.M.

 



 

On Appeal from the 328th
District Court

Fort Bend County, Texas

Trial Court Cause No. 03-CV-130664

 



 

M E M O R A N D U M   O P I N I O N

Miroslava Espinosa (AEspinosa@) appeals the termination of her
parental rights to E.S.C. and L.M.M., her two daughters.  In six issues, she argues: (1) the evidence
is legally and factually insufficient to support termination on the four
statutory grounds found by the trial court, (2) the evidence is legally and
factually insufficient to support a finding that termination was in the
children=s best interest, and (3) that the
statutory time limits for disposing of termination cases are unconstitutional
as applied in her case.  We affirm.

Factual
Background








At 8:45 p.m. on June 9, 2003, Espinosa, her sisters Gloria
and Disney, and E.R. (Espinosa=s seven-year-old cousin) went to a Randalls grocery store.[1]  While Gloria and E.R. remained in the parking
lot with the car, Espinosa and Disney entered the store.  Espinosa picked up a handheld basket,
selected merchandise, and placed it in the basket.  Espinosa then left the basket in the store
and exited the building.  Disney also
left the store.

When Espinosa and Disney were safely inside the car, Espinosa
sent E.R. inside the store to retrieve the basket without paying for the
merchandise.  After about a minute of
searching, E.R. left the store without the basket.  (Surveillance video depicts E.R., apparently
concerned about her inability to find the basket, wringing the front of her
T-shirt in her hands.)  E.R. returned to
the car.  After further discussion,
Espinosa sent E.R. back inside the store to retrieve the basket.  Espinosa even followed E.R. as far as the
store=s interior automatic doors to watch
E.R.=s progress.  Once E.R. found the basket of merchandise,
Espinosa immediately walked back to the car. 
Seconds later, E.R. rushed out of the store lugging the basket of
merchandise.  E.R. ran toward an open
door of Gloria=s car with a store employee in hot
pursuit.  When Espinosa saw the store
employee chasing E.R., she panicked and 
closed the car door.  E.R. then
attempted to run to the far side of the Aget-away car,@ but she was apprehended by the store
employee before she could escape.  While
he restrained E.R., the store employee yelled to Espinosa and her sisters to
get out of the car.  At that moment, a
police car drove into the parking lot, and Espinosa immediately told Gloria to Adrive off.@

After making a successful escape, Espinosa made several
telephone calls requesting to pick up E.R., but never left a name or phone
number.  No one claimed the child, and
E.R. was taken into custody by the Texas Department of Protective and
Regulatory Services (ATDPRS@) and placed in foster care.[2]








Espinosa evaded the police for two weeks while the
shoplifting incident and child abandonment were recounted on local and national
news programs.  Four days after the
incident, Espinosa reported a change of address to the Department of Human
Services so she could receive her Temporary Assistance for Needy Families check
and Medicaid benefits.  A week after the
incident, she called a trade school and inquired about starting their
program.  An admissions representative
recognized Espinosa=s name from the news and contacted the police.  The representative then called Espinosa and
invited her to come in and discuss a scholarship.

On June 24, 2003, despite 
having a Afeeling@ she might be arrested, Espinosa appeared for the meeting
with her fifteen-year-old sister Disney and three-year-old daughter,
E.S.C.  Espinosa and Disney were arrested
when they arrived (Disney resisted a search and had to be subdued by two
officers).  Because they were minors,
Disney and E.S.C. were taken into TDPRS custody.  Espinosa also had a one-year-old daughter,
L.M.M., but she refused to provide TDPRS with an address or any means of
locating L.M.M., even though TDPRS had legal custody of the child.  In two or three different stories, Espinosa
stated L.M.M. was with her mother.[3]  Police, however, had an open arrest warrant
for Espinosa=s mother stemming from an aggravated
assault involving a deadly weapon in Hidalgo, Texas.

As law enforcement authorities continued their investigation,
it became clear that shoplifting was Aa way of life@ for Espinosa=s family.  Espinosa=s mother, Sylvia Reyes, for example, had
been to prison for engaging in organized crime, had an extensive criminal
history, and was in jail again at the time of Espinosa=s parental termination trial.  All of Espinosa=s immediate family members and
several of her aunts, uncles, and cousins had criminal histories.  Espinosa was arrested for shoplifting eleven
times as a juvenile.  Espinosa=s sister Disney admitted to
shoplifting on at least three occasions. 
Both Disney and Gloria were present at the family shoplifting trip the
night E.R. was abandoned.  Espinosa  was arrested two weeks after the incident and
convicted of third-degree felony child abandonment.  She received a three-year sentence.  Gloria evaded the police for four months
before she was arrested and convicted. 








The family had a particular methodology for shoplifting.  One or two adults would take a child into a
store and pretend to shop, filling a cart with items like cases of beer, large
boxes of laundry detergent, perfumes and lotions.  Once the cart was full of merchandise, the
adults would casually stroll away, leaving the child to push it past registers,
employees and security into the parking lot.

It is not clear exactly how many times E.R. was used to
steal.  E.R. said it was twenty
times.  Espinosa changed her testimony
from once, to a couple of times, to five times. 
Espinosa admitted, however, that she lied repeatedly to police, TDPRS,
and under oath at her criminal and termination trials.[4]  Testimony at trial established E.R. was used
to shoplift on at least seven separate occasions within a few weeks.  In fact, she averaged approximately one theft
every three days.[5]








These incidents raised concerns regarding the welfare of
Espinosa=s own children.  Investigators discovered that Espinosa was
seventeen years old when she gave birth to E.S.C.  The father of the child, Alberto Cardozo,
whom Espinosa met when she was sixteen, was thirty-four years old.  Espinosa lived with Cardozo for just over a
year while her mother was in prison for organized crime.  The relationship ended soon after her mother
was released from  prison, when E.S.C.
was seven months old.  Espinosa then
moved to Reynosa, Mexico, with her mother, daughter, and sisters.  E.R. came to live with them during this time.[6]

Thereafter, the Afamily@ moved periodically between an
apartment in Hidalgo, Texas and the family home in Reynosa each week over the
next two years to continue public school in the United States.  Alvaro Molina lived with Espinosa off and on
during this time, and Espinosa had L.M.M. in May of 2002, after a one-time
encounter with L.M.M.=s alleged father, Sergio Orozco.[7]  In May of 2003, Espinosa=s mother moved to Houston with
Gloria, Disney and the children. 
Espinosa stayed in Hidalgo with her stepmother to finish high
school.  She graduated on May 23, 2003,
and moved immediately to Houston to live with her mother.  When E.S.C. and L.M.M. were taken into
custody by TDPRS, they had never lived in one place for more than three
months.  Espinosa admitted to moving
fifteen times between E.S.C.=s birth in
February of 2000 and her arrest in June of 2003.

Although E.S.C. was not used to being on a schedule, she was
healthy and had only minor developmental delays when she was taken into foster
care.  She was placed in the same foster
home with E.R., which comforted both girls because of their close Asisterly@ relationship.  However, when E.S.C. came into the home, the
foster mother noticed that E.R. began laying out her cousin=s clothes and immediately took on a
much larger caregiving role than usual for E.R.=s age. 

L.M.M. was located on October 20, 2003, by the same officer
who had arrested Espinosa and Disney.  He
was working a second job at a hospital when he saw Gloria and L.M.M. in the
emergency room.  Gloria had brought
L.M.M. to the emergency room due to a cold or cough.  The officer knew Gloria was wanted by the
police and that TDPRS was looking for L.M.M. 
He arrested Gloria and entrusted L.M.M. to emergency room personnel.








L.M.M. was treated and sent to the same foster home where
E.S.C. and E.R. were being cared for. 
The foster mother testified L.M.M. came to her home with a high fever
and ear infection.  She was throwing up,
had diarrhea, and had a severe fungus rash all over her body.  The fungus was painful and in several stages
of healing.  The fungus had caused
scarring and the loss of skin pigment in places.  Moreover, the fungus was all over the child=s body including her forehead, and it
made her lower back and bottom bloody. 
It took several months of treatment to clear the fungus because it kept
spreading to other parts of her body. 
Due to the severity of the infection, the pigment in patches of L.M.M.=s skin is not expected to return for
several years.

To complicate matters further, L.M.M. also had a severe case
of Anursing bottle syndrome.@[8] 
L.M.M. had apparently been fed primarily from a bottle despite being
seventeen months old.  She had delayed
self-feeding skills (she could not use a pincer grasp to pick up Cheerios), and
her teeth were rotted to the gumlineCmany were only black, Achipped knobs.@ 
In February of 2004, L.M.M. was hospitalized and put under general
anaesthesia for surgery to repair her teeth, have some of the nerves removed,
and have many of her teeth crowned. 

When L.M.M. first arrived at her foster home, she was unhappy
and cried often.  She would lay down and
look at toys, but would not play with them. 
The foster mother had to get down on the floor and work with her.  She started to make improvements only after
she began physical therapy, her rash had cleared, and her teeth had been
fixed.  At  seventeen months, she was significantly
delayed in expressive language, physical abilities, and gross and fine motor skills:  She could not speak any words, was
overweight, had bowed legs, and could not stand or walk well.  Since coming under foster care, L.M.M. has
been in speech and physical therapy. 
Although she required occupational and speech therapies one year after
entering foster care, she is now more or less developmentally on target.








            E.R., E.S.C., and L.M.M. are very close and still together in
the same foster home.  However, E.R. has
expressed concern for E.S.C. and L.M.M.=s safety should they be returned to
Espinosa or her family.

Following a bench trial, the judge severed Espinosa=s parental rights to both of her
daughters on grounds she (1) knowingly placed or knowingly allowed the children
to remain in conditions or surroundings endangering their physical or emotional
well‑being, (2) engaged in conduct or knowingly placed the children with
persons who engaged in conduct endangering the children=s physical or emotional well‑being,
(3) failed to support the children in accordance with her ability during a
period of one year ending within six months of the date of the filing of the
petition, and (4) was convicted for being criminally responsible for the
serious injury of a child under Texas Penal Code section 22.041 (abandoning a
child) for conduct that caused the serious injury of a child and that would
constitute a violation of the same penal code section.[9]  The court also found the children=s best interests were served by
termination.  Espinosa contends on appeal
that the evidence is legally and factually insufficient to support each of the
above findings.

Standard of Review








For a trial court to sever the
fundamental interest a parent has in the care, custody, and management of her
natural child there must be clear and convincing evidence proving (1) at least
one statutory ground for termination and (2) that termination is in the child=s best interests.  Tex.
Fam. Code Ann. ' 161.001(1), (2) (Vernon 2002).  Because parental rights are Afar more precious than any property
right,@[10] clear and convincing evidence is the
measure or degree of proof that produces in the mind of the trier of fact a
firm belief or conviction that the allegations are true.  In re C.H., 89 S.W.3d 17, 25B26 (Tex. 2002).  Therefore, in a case involving the
termination of parental rights, proceedings should be strictly scrutinized and
the involuntary termination statutes should be strictly construed in favor of
the parent.  Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985).

In reviewing the legal sufficiency of evidence supporting
termination, we look at all evidence in a light most favorable to the finding
to determine whether a reasonable trier of fact could have formed a firm belief
or conviction the finding is true.  In
re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). 
We assume the fact finderChere, the trial courtCresolved disputed facts in favor of
its finding if it was reasonable to do so, and we disregard all evidence it
could have reasonably disbelieved.  Id.  This does not mean we disregard all evidence
that does not support the findingCdoing so could skew our
analysis.  Id.  If we find no fact finder could reasonably
form a firm belief or conviction the matter to be proven is true, we must
conclude the evidence is legally insufficient. 
Id.

In a factual sufficiency review, we give due consideration to
evidence the fact finder could reasonably have found to be clear and
convincing, and we examine whether this evidence is such that a fact finder
could reasonably form a firm belief or conviction the allegations are
true.  Id.  We consider whether the disputed evidence
is such that the fact finder could reasonably resolve it in favor of its
finding.  Id.  If, in light of the entire record, the
disputed evidence that a reasonable fact finder could not have credited in
favor of its finding is so significant the fact finder could not have
reasonably formed a firm belief or conviction in favor of termination, we must
find the evidence factually insufficient. 
Id.

Child Endangerment
as Grounds for Termination








The trial court included four statutory grounds in its order
terminating Espinosa=s parental rights. 
Only one must be found, coupled with the child=s best interests, for the termination
to stand.  Tex. Fam. Code Ann. ' 161.001.  Included in the termination order are
subsections D and E of the involuntary termination statute, i.e., that Espinosa
knowingly placed or allowed her children to remain in conditions or
surroundings endangering their physical or emotional well-being, and engaged in
conduct or knowingly placed the children with persons who engaged in conduct
endangering their physical or emotional well-being.  Id. at ' 161.001(D), (E).

Subsections D and E provide statutory grounds for termination
when a child is endangered by a parent=s knowing acts or omissions.  Id. 
Endangerment occurs when a child is exposed to loss or injury, or is
jeopardized.  Tex. Dep=t. of Human Servcs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987).  A parent has endangered her child
when her conduct creates a potential for danger of which the parent is aware,
but disregards.  In re S.M.L., 171
S.W.3d 472, 477 (Tex. App.CHouston [14th Dist.] 2005, no pet.).  Subsection D concerns a child=s environment, of which a parent=s conduct is a part, and subsection E
requires that a parent=s conscious course of conduct be the cause of the child=s endangerment.  Id. 
We analyze the evidentiary sufficiency of grounds D and E together.

The Children=s Exposure to
Loss, Injury or Danger

Espinosa argues that neither endangerment ground is supported
by legally or factually sufficient evidence. 
She claims E.S.C. and L.M.M. were not involved in the family=s shoplifting, they were not old
enough to understand what was happening, and they were not endangered while in
her care.  Espinosa also argues there is
insufficient evidence to show E.S.C. was instructed, taught, or used to steal.

AThe fundamental liberty interest of
natural parents in the care, custody, and management of their child does not
evaporate simply because they have not been model parents or have lost
temporary custody of their child to the State.@ 
Santosky, 455 U.S. at 753. 
It is, therefore, something moreChere, an endangering environment the
parent knows about but disregards, or a parent=s course of conduct that endangers
the childCthat must be proven at trial by clear
and convincing evidence.  Even though
endangerment encompasses more than a threat of metaphysical injury or the
possible ill effects of a less-than-ideal family environment, it is not
necessary that the conduct be directed at the child or that the child actually
suffer injury.  Boyd, 727 S.W.2d
at 533.








Each of Espinosa=s shoplifting trips posed a threat of
arrest of which she was well aware, having been arrested eleven times as a
juvenile for shoplifting.  Each trip also
posed a risk of injury:  E.R. reported
that whoever drove away from a store after shoplifting would drive very fast,
that she was in the car once when it was going fast, and she was scared.[11]  E.S.C. was three when she was taken into
TDPRS custody.  Espinosa admitted she had
already taken E.S.C. along on one shoplifting trip, and that doing so
endangered E.S.C.  Despite this
admission, Espinosa now argues that taking E.S.C. in the car one time did not
result in any danger to the child. 
Actual injury, however, is not our inquiry.  We conclude 
Espinosa=s course of conduct directly resulted in the physical
endangerment of E.S.C.  Placing E.S.C. in
a Aget-away car@ also shows that Espinosa did not
attempt to isolate her from an environment sustained by continual criminal
enterprise.  She knowingly included
E.S.C. in the family=s criminal behavior and exposed her to its inherent risks,
including the potential loss of her family and home, which jeopardized her
emotional well-being.  E.R. also reported
that, when living with Espinosa, E.S.C. stole candy by putting it in her
pocket.  This further evidences the fact
that E.S.C. was affected by and even influenced by the family=s criminal lifestyle.








Espinosa allowed her children to live with a family in which
everyone participated in shoplifting. 
The family had a well-established method of using children to steal so
that adults could attempt to avoid prosecution. 
E.S.C. had already begun stealing at three years of age.  The law does not require the State to wait
until each child in a family is personally victimized before it may terminate a
parent=s rights.  Dir. of Dallas County Child Protective
Servs. Unit v. Bowling, 833 S.W.2d 730, 733 (Tex. App.CDallas 1992, no pet.).  Espinosa admitted her residence and
association with people who engaged in criminal activities endangered both of
her children.  Espinosa also admitted to
allowing her unlicensed, fifteen-year-old sister drive the Aget-away car@ at times.  Espinosa further admitted what she did to
E.R. was emotionally damaging and dangerous and that, because she forced E.R.
to steal, she understands why others would be concerned about the risk to
E.S.C. and L.M.M.

As for L.M.M.=s well-being, Espinosa argues that her health problems
developed only after she left Espinosa=s care, and that there is no evidence
Espinosa knew L.M.M. was not receiving proper care or that she perpetrated a
course of conduct that harmed her children. 
Espinosa fails to consider, however, that it was she who secreted her
daughter with relatives who were wanted by the police, and that she then
refused to disclose how L.M.M. could be located to ensure her health and
safety.  Espinosa=s lies to TDPRS about L.M.M.=s whereabouts prevented TDPRS from
providing the care L.M.M. needed, which could have prevented the fungal
infection.  The neglect L.M.M. endured
was a direct result of Espinosa=s choice not to disclose 
the child=s  location due to the
family=s criminal lifestyle.  When L.M.M. was first examined, the rash was
so severe it would have been Aclearly present@ for a Aminimum of two weeks, perhaps as long
as four weeks.@ 
Therefore, even though Gloria took L.M.M. to the hospital in October,
the baby was left to endure this rash for weeks without care.  It is untenable, in light of the record
presented here, that Espinosa was not aware of the type of care L.M.M. would
receive when she was left with Espinosa=s mother and sister Gloria.  The family is extremely close and Espinosa
has lived almost her entire life with these women.  Espinosa decided to leave to chance L.M.M.=s health, safety, and home
environment in order to protect her own interests in the child.








Espinosa=s psychological evaluation indicates she is emotionally
immature for her age and appears to be more concerned about her own needs than
the needs of others.  Her responses are
similar to that of an adolescent, showing rebelliousness, over-idealized images
of love, and perhaps difficulty with authority figures.  After examining Espinosa, a psychologist
reported that her emotional immaturity lends to bad decision-making regarding
her children, and that Espinosa is likely to engage in parent-child role
reversal (seeing her children as gratifying her own needs for love).  The psychologist further testified that
individual therapy would probably be ineffective because Espinosa appears
satisfied with herself and does not seem to think she needs help.  He reported that, with emotional growth and
maturity, she has the future capacity for responsibility but it would take a
long time and much hard work before this change could occur.  To Aachieve success,@ he stated Espinosa would first need
to be open and honest with herself and others.

Espinosa=s life of crime and extremely poor decision-making adversely
affected E.S.C. and L.M.M.  Espinosa
provided an unstable home environment that consisted of frequent moves,
allowing her children around various people who routinely engaged in crime,
allowing E.S.C. to ride in the car on a family shoplifting expedition, and
neglecting the physical needs of L.M.M. 
The entire family emotionally abused and exploited the one child old
enough to be useful to the criminal enterprise.[12]  The record clearly shows Espinosa engaged in
a conscious course of conduct leading up to her imprisonment that jeopardized
her children=s emotional and physical well-beingCthis is sufficient to support
termination as to subsection E.  See
Boyd, 727 S.W.2d at 534.  As for
subsection D, the evidence shows the children were exposed to a neglectful and
emotionally abusive environment that endangered both children=s physical and emotional well-being. 

Accordingly, we find there is clear and convincing evidence
establishing both endangerment grounds for termination.  We need not address Espinosa=s evidentiary challenges to the two
remaining involuntary termination grounds listed by the trial court.

The Children=s Best Interests








Espinosa argues there is legally and factually insufficient
evidence to support a finding that termination is in her children=s best interests.  There is a strong presumption that the best
interests of the child are served by staying with her natural parent, and the
burden is on TDPRS to rebut that presumption. 
In re U.P., 105 S.W.3d 222, 230 (Tex. App.CHouston [14th Dist.] 2003, pet.
denied).  The trier of fact must
determine whether termination is in a child=s best interests.  In making that decision, the fact finder must
consider many issues, such as:  (1) the
child=s desires, (2) the present and future
emotional and physical needs and dangers to the child, (3) parenting abilities
involved, (4) programs available to help the parent, (5) TDPRS plans for the
child and the stability of the proposed placement, (6) any of the parent=s acts or omissions indicating the
relationship is not a proper one, and (7) whether there is any excuse for those
acts or omissions.  Holley v. Adams,
544 S.W.2d 367, 371B72 (Tex. 1976).  This
list is not exhaustive, nor is evidence required on each listed factor to
support the court=s finding.  Id.

Espinosa does not argue that her children=s interests are better served by
living with her.  She contends, instead,
that some circumstances are such that, although it is not in a child=s best interests to be returned to
the parent, neither is it best for the parent=s rights to be terminated.  She gives an example that, when a parent is
out of work or ill, it may be best that the parent maintain a limited amount of
possession and access while the child is temporarily or even permanently raised
by someone else.  Espinosa contends the
evidence at trial cannot support termination when there is a viable alternative
to termination such as  granting
permanent managing conservatorship (APMC@) to the State or some other person,
and allowing Espinosa to maintain some minimal contact with her children.  To fully address her argument, we must look
to other provisions in the Texas Family Code.








A trial court may not arbitrarily circumvent the statutory
dismissal date in parental termination cases. 
Tex. Fam. Code Ann. ' 263.401 (Vernon 2002 & Supp.
2005) (mandating dismissal of termination cases within 12 to 18 months); see
also Tex. Sen. Jurisprudence Comm.,
Bill Analysis, Tex. S.B. 181, 75th Leg., R.S. (1997) (noting State=s interest in dismissal date is with
the children because delays and changes that take place while a child is in
State custody are detrimental to the child). 
Therefore, if a trial court seeks to issue a final order granting PMC to
TDPRS without terminating the parent=s rights, the court must find that
(1) it is not in the child=s best interests for the parent to be appointed managing
conservator because to do so would significantly impair the child=s physical health or emotional
development, and (2) it is not in the child=s best interests to appoint a
relative or another person as managing conservator.  Tex.
Fam. Code Ann. ' 263.404(a) (Vernon 2002). 
In making this decision, the court must consider (1) whether the child
will reach age eighteen within three years, (2) whether the child is over
twelve years old and has expressed a strong desire against termination or
adoption, (3) whether the child has special medical or behavioral needs that
make adoption unlikely, and (4) the child=s needs and desires.   Id. at ' 263.404(b).  Neither party addressed the requisites of
this statute at trial or on appeal. 
Nevertheless, the record shows that, at the time of the termination
trial, the children were ages four and two, E.S.C. expressed a strong desire to
stay with her foster mother, neither child has any continuing special needs,
and the foster mother would like to adopt both girls if Espinosa=s rights are terminated.[13]  The trial court could not have granted PMC to
TDPRS based upon these criteria.








Furthermore, after reviewing the entire record, we find the
evidence is such that a fact finder could reasonably form a firm belief or
conviction that termination is in the children=s best interests.  At the time of the trial, Espinosa was in
prison and would remain there for at least another ten or eleven months.  Witnesses for the State emphasized the
importance of permanency to these childrenCthat they must be able to go on with
their lives.  At the time of the
termination trial, the children were thriving in a loving, adoptive placement,
and had lived there longer than they had ever lived in one place at a time.  L.M.M. did not remember any other home,
E.S.C. was Aadamant@ that the judge should know she
wanted to stay with her foster mother, the girls were receiving therapy, and
they had bonded with their foster family. 
Several witnesses testified it is best to keep all three girls together
because of their close relationship.

Espinosa cites to In re K.C.M. to support her factual
insufficiency argument.  See In re
K.C.M., 4 S.W.3d 392, 398B99 (Tex. App.CHouston [1st Dist.] 1999), disapproved of on other grounds,
89 S.W.3d 17, 26 (Tex. 2002) (holding personal progress in jail including
attendance of Alcoholics Anonymous, ten months of sobriety, and life skills
classes rendered evidence of drug abuse and crime before incarceration
factually insufficient to support finding that termination is in child=s best interests).  Espinosa=s behavior while incarcerated is
similar to that of the In re K.C.M. parent.  Espinosa has done what she can from jail,
including attending Alcoholics Anonymous meetings (she does not admit to a drug
or alcohol problem), Bible study, being a trustee at the jail, and sending the
children letters and pillowcases.  This
Court, however, has held that good behavior in prison does not necessarily make
evidence supporting a best interest finding in favor of termination factually
insufficient; instead we look to factors such as whether the parent has
attempted to escape life-long addictions and abusive relationships.  In re M.G.D. and B.L.D., 108 S.W.3d 508,
513 (Tex. App.CHouston [14th Dist.] 2003, pet.
denied).  








The evidence overwhelmingly shows Espinosa does not believe
she is in need of change.  She admits
that she lies repeatedly in order to get what she wants and does not tell the
truth (even at trial) unless she is caught in a lie.  She further acknowledges that her Aimmature@ level of moral development affects
her ability to parent, to teach her children what is right, and to obey the
law.  Moreover, Espinosa has maintained
close ties to at least one family member throughout her trial, despite her
testimony that she would stay away from her family in order to better
herself.  She also testified she wants
both girls to know about her mother and sisters.[14]  Espinosa and her family also traveled often
between Mexico and the United States, and she was considered a flight risk
prior to her criminal trial.  We find
this record shows that, despite Espinosa=s attendance at a few programs in
jail, she has not attempted to begin the hard work necessary to escape her life
of crime, or to keep her children from the familial relationships that lend to
that life.

The trial court received evidence that permanency is
essential to the children.  Allowing TDPRS
to maintain conservatorship for another fourteen or sixteen years is not a
permanent setting, and denies the children the ability to move on with their
lives.  Although it might serve Espinosa=s interests to grant PMC to the
State, it would not be in the children=s best interests.  We find there was clear and convincing
evidence at trial to support the judge=s finding that termination is in the
children=s best interests.  See In re C.H., 89 S.W.3d at 26
(stating emotional and physical interests of child cannot be sacrificed to
preserve parent=s fundamental interest in parent-child relationship).

Constitutionality
of Statutory Time Constraints

Espinosa argues the time limits imposed in termination cases[15]
are arbitrary and  unconstitutional as
applied to her, and that they violate her due process and due course of law
rights.  U.S. Const. amend. XIV; Tex.
Const. art. I, ' 19.  Because she did
not raise this issue at trial, she cannot now assert it on appeal.  See
Tex. R. App. P. 33.1; see also In re B.L.D., 113 S.W.3d 340, 353
(Tex. 2003) (holding court of appeals erred in holding that the process
requires review of certain unpreserved complaints in parental rights
termination cases).

We affirm the trial court=s judgment.

 

/s/        J. Harvey Hudson

Justice

 

Judgment rendered
and Memorandum Opinion filed March 30, 2006.

Panel consists of
Justices Hudson, Seymore, and Guzman.











[1]  Espinosa was
twenty-one, Gloria was nineteen, Disney was fifteen, and E.R. was seven yeas
old.





[2]  E.R. was later
adopted by her foster mother.





[3]  At her
criminal trial, Espinosa stated L.M.M. was with one of her cousins.  She told a detective L.M.M. Awas in good hands@ with a
cousin, but that the cousin would probably leave L.M.M. with Espinosa=s mother.  She
told TDPRS that L.M.M.=s father had the infant in Mexico, an admitted lie.





[4]  When asked
whether Athe only things you=ve come
clean and told the truth on are those things that you can be caught in the lie,@ Espinosa replied, Ayes.@  Espinosa, who
was the first witness on the first day of a three-day trial, admitted it was
fair to say she had no credibility Aat this
point in the case.@





[5]  E.R. was
caught pushing a cart of groceries out of an H.E.B. grocery store two weeks
before she was abandoned at Randalls.

In another incident in late May or early
June of 2003, Espinosa, her mother, and E.R. were followed by security
personnel at a Wal-Mart store for approximately 
two  hours because they had seen
Espinosa and her mother on previous occasions and Aknew what they were up to.@  The security
personnel watched as Espinosa and her mother filled a shopping cart.  When it was full, they walked away and E.R.
pushed it out of the store, with Espinosa walking about ten feet in front of
the cart.  When security personnel yelled
for E.R. to stop, Espinosa took off running, 
did not look back, and effectively abandoned E.R.  E.R. did not try to run away.  She was clearly frightened and repeatedly
apologized to store officials saying her aunt made her do it.  Store security released E.R. to the police,
who then released E.R. to an Auncle@ before TDPRS could arrive.

In yet another incident that occurred just
three days before E.R. was left at Randalls, Gloria and Disney used E.R. in an
attempt to steal a cart filled with laundry detergent at the same grocery
store.

Espinosa also admitted to using E.R. to
steal at a Walgreens drug store more than once, and Aprobably@ at a
Toys R Us store.





[6]  E.R. was born
in March of 1996, and lived with several different family members.  She lived with Reyes and her family until she
was two, then with other family while her mother was in prison, and again with
Reyes and her family in 2002 after her parents were deported to Mexico.





[7]  Espinosa
believed Alvaro Molina to be L.M.M.=s father
and they lived together for a few months with both girls after L.M.M. was
born.  Molina was ruled out as L.M.M.=s father by DNA testing.  Espinosa next provided Sergio Orozco=s name as the alleged father; he was never located.





[8]  Nursing bottle
syndrome is caused from the excessive use of a bottle filled with a sweet
substance like juice or soda.





[9]  Tex. Pen. Code Ann. ' 22.041 (Vernon Supp. 2005).





[10]  Santosky v.
Kramer, 455 U.S. 745, 758B59 (1982) (quoting Stanley v. Ill., 405 U.S.
645, 651 (1972)).





[11]  The H.E.B. store employee who
stopped E.R. testified that after E.R. had left in one car, he witnessed
Espinosa and Gloria drive off in another car Aat kind of a high rate of speed.@  The Randalls
surveillance video also shows Gloria driving away quickly to escape the police.





[12]  E.R. reported
Espinosa once hit L.M.M. with a belt, that E.S.C. would be disciplined with
spankings or hair pulling, and E.R. would have her hair or ear pulled.  She said no one in the home would make
breakfast for the children, and that they would have to eat whatever leftovers
they could findCthe kind of food that Amade children=s tumm[ies] hurt.@  E.R. said she
did not go to school on a regular basis. 
She reported that E.S.C. was given sips of beer when she was two or
three years old, and that the adults smoked moeta (marijuana)
routinely.  E.R. listed her chores,
including changing the baby=s diapers, preparing food, cleaning the bathrooms,
dusting the living room furniture, and vacuuming.  E.R.=s
therapist noticed calluses on the back of E.R.=s hands
that looked like burns.  There is also
evidence this seven-year-old child was a primary caretaker of Espinosa=s two children.





[13]  Espinosa gave
the names of several friends and relatives to TDPRS as possible temporary or
permanent homes for the children.  When
TDPRS investigated these possibilities, it was met with refusals, one hang up,
criminal histories (one involving child abandonment similar to E.R.=s case), and people who were not family and did not
know the children.  The only placement
TDPRS could consider was with a nineteen and twenty-year-old newlywed couple
who were expecting their first baby and did not want to adopt the girls.  They were planning to move from their
one-bedroom apartment and the man, a cousin of Espinosa=s, testified he believes the children should know
their aunt Gloria, grandmother Reyes, and mother Awhen she
gets out of prison and . . . has custody of them.@





[14]  The trial
court specifically found that the Atap root@ of the close bonding within this immediate and even
extended family is the desire to maintain a Acrime
machine.@ Espinosa=s
psychological exam showed a strong relationship with her mother and
sisters.  Her sister Gloria attended each
day of the termination trial and even obtained evidence for Espinosa in the
middle of trial.





[15]  See Tex. Fam. Code Ann. ' 263.401 (requiring a court to dismiss a termination
case or render a final order within one year).