COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-09-219-CV

 

 

IN THE INTEREST OF M.V., JR., A CHILD

 

 

                                              ------------

 

           FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. 
Introduction

In one
issue, Mother appeals the termination of her parental rights to her child,
M.V., Jr. (AMichael@),[2]
complaining that the evidence is insufficient to support the trial court=s best
interest finding.  We affirm.








II. 
Factual and Procedural History

Mother
began using cocaine when she was nineteen; she was twenty-four at the time of
the termination trial.  According to
Tracy Clary, a Child Protective Services (ACPS@)
investigator, Mother told her that prior to her pregnancy she would use cocaine
on the weekends, and during the first four months of her pregnancy, she used
cocaine daily.  Mother slowed her cocaine
use to once a month after those first four months of pregnancy because her body
could no longer tolerate it.  Her average
spending on cocaine was $400 to $500 per week. 

In June
2008, Mother was convicted of prostitution, but she testified that she only
engaged in prostitution twice while pregnant with Michael.  Mother went to jail on two different
occasions while pregnant with Michael.

On
August 2, 2008, Mother entered the hospital and tested positive for
cocaine.  Michael was born the next day
and tested positive for cocaine.  Clary
testified that when CPS removed Michael from Mother and placed him into foster
care, Mother admitted that she was not in a position to provide adequate care
for him.








Of the
four names Mother gave Clary to investigate for voluntary placement with a
relative prior to placing Michael in foster care, none were approved:  one would not give to CPS the information it
needed for a criminal background check; two had CPS histories; and one had a
criminal history.  One of the individuals
with a CPS history was Mother=s
brother, S.V.; another was her sister, M.V.[3]  M.V.=s CPS
history involved drugs found in her home, although Mother testified that the
drugs belonged to the father of M.V.=s
children, who was no longer around.  M.V.
testified that the children=s father
was not allowed to come to her house to see the children without his probation
officer=s
signature because of the safety plan in place. 
At the time of trial, Mother lived with M.V., who had three children,
ages ten, six, and two.

The
criminal history belonging to one of the other individualsCMother=s
twenty-six year-old sister A.V.Cwas
attributed to Mother using A.V.=s name
and date of birth when arrested. 
However, A.V. was not able to show paperwork at trial to account for the
charges filed under her name, stating she had switched purses and Aleft all
that information.@ 
Mother testified that she had used both M.V.=s and
A.V.=s names
when convicted.  M.V. testified that her
only real criminal history was a felony from 1998 for auto theft.








On
August 6, 2008, three days after Michael=s birth,
Mother accepted an offer from the Department of Family and Protective Services
(ADFPS@) to
participate in Tarrant County=s Family
Drug Court program.  Mother testified
that she could not remember what happened the next day, when CPS was supposed
to visit her home, stating AI think
I went down the street or something.@  Mother was discharged from the Drug Court
program on August 21, 2008, for lack of participationCspecifically,
her failure to appear.  CPS caseworker
Melanie Scott testified that Mother told her that she continued to use drugs
while on the waiting list for the Drug Court program.

Between
September and November 2008, Mother was convicted of criminal trespass and
delivery of a controlled substance.  In
December, after she was released from jail and had moved to Austin to live with
one of her sisters, she contacted CPS about seeing Michael and starting to work
on her service plan.








By trial
in June 2009, Mother had completed the first part of her parenting classes, set
up her counseling sessions, submitted to drug testing, taken her psychological
evaluation, visited Michael, and kept the job she had found at the end of
February 2009.  However, she tested
positive on her June 2009 drug test, failed to provide proof of her attendance
at Narcotics Anonymous meetings (which she testified she had started attending
in June 2009),[4]
and lived with M.V. because she could not get an apartment on her own due to
her recent criminal history.[5]  Mother testified that her June 2009 hair
follicle drug test was positive because she had used cocaine three months
before and that she had been attending the NA meetings but had left her
paperwork at home.








Scott
testified that Mother still seemed unable to financially support Michael and
that according to her pay stub, Mother=s net
pay was $272.49 per forty-hour week. 
Mother testified that her paycheck was usually $320 per week, but up to
$900 or $1,000 depending on overtime, with no insurance. Mother=s visits
with Michael were only once a month because she lived in Austin while he
remained in foster care in Tarrant CountyCby
trial, she had seen Michael five times. 
Scott acknowledged that the visits between Mother and Michael went
fairly well, but she also noted that Mother had never expressed any concerns to
her about whether Michael had any developmental needs and that Mother had never
told her how she would afford day care or provide clothing for Michael.

By
trial, Mother had not finished her parenting classes.  Scott testified that Mother told her she had
not finished the parenting classes because they conflicted with her work
schedule.  Mother testified that she
could figure out a way to finish the parenting classes by dropping a shift at
work.

Scott
testified that it would be in Michael=s best
interest to terminate both parents= rights
and that CPS=s plan if those rights were
terminated was for Michael to be adopted by his foster mother, who had
expressed an interest in adopting him. 
She testified that Michael was thriving in his foster environment and
described Michael and his foster mother as well-bonded in a good, safe, and
stable home in a safe neighborhood.[6]













When
asked how she would be able to take care of Michael if he were placed with her,
Mother acknowledged her cocaine addiction and that she had Amessed
up back in the day,@ but she stated that she was
changing and was different now than she had been in the past.  She testified, A[T]hat=s my
first child, and I don=t want to give up my first child
like that, and I=m going to do everything I have
to.@  As for day care for Michael, she testified
that when her sister cleared her criminal background, Athen I=ll let
her and I=ll either get, like, help with
day care or something.@ 
Scott testified that Mother was dependent on her sister for
transportation, but Mother testified that she had a car and a driver=s
license but no car insurance.  Mother
testified that her plans for the future were to continue attending NA A[a]nd to
keep on doing positive things and hanging around positive people and my family
who is positive.@ 
She suggested that she could also go to her grandmother=s house
as a place to stay and offered to provide her grandmother=s name
to CPS to do a home study.        Mother
asked the trial court not to terminate her parental rights and to consider A.V.
for placement if it found Mother was not in a position to take care of
Michael.  Mother also stated that, if the
trial court did not find A.V. suitable, Mother would be willing to find another
place to live so that M.V. could be considered for placement.  The trial court terminated Mother=s
parental rights to Michael, finding that Mother had endangered Michael and that
termination would be in Michael=s best
interest.[7]  See Tex. Fam. Code Ann. ' 161.001(1)(D),
(E), (2) (Vernon Supp. 2009).  This
appeal followed.

III. 
Sufficiency of the Evidence

A.  Standard of Review








A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d 17, 26 (Tex.
2002).  In a termination case, the State
seeks not just to limit parental rights but to erase them permanentlyCto
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. ' 161.206(b)
(Vernon 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination
proceedings and strictly construe involuntary termination statutes in favor of
the parent.  Holick, 685 S.W.2d at
20B21;
In re M.C.T., 250 S.W.3d 161, 167 (Tex. App.CFort
Worth 2008, no pet.).

In
proceedings to terminate the parent‑child relationship brought under
section 161.001 of the family code, the petitioner must establish one ground
listed under subsection (1) of the statute and must also prove that termination
is in the best interest of the child. 
Tex. Fam. Code Ann. '
161.001; In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human Servs. v. Boyd, 727
S.W.2d 531, 533 (Tex. 1987).








Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code Ann. ''
161.001, 161.206(a) (Vernon 2008). Evidence is clear and convincing if it Awill
produce in the mind of the trier of fact a firm belief or conviction as to the
truth of the allegations sought to be established.@ Id.
' 101.007
(Vernon 2008).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In
re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In re J.A.J.,
243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and
modification). 

In
reviewing the evidence for legal sufficiency in parental termination cases, we
must determine whether the evidence is such that a factfinder could reasonably
form a firm belief or conviction that the grounds for termination were
proven.  In re J.P.B., 180 S.W.3d
570, 573 (Tex. 2005).  We must review all
the evidence in the light most favorable to the finding and judgment. Id.  This means that we must assume that the
factfinder resolved any disputed facts in favor of its finding if a reasonable
factfinder could have done so.  Id.
We must also disregard all evidence that a reasonable factfinder could have
disbelieved.  Id.  We must consider, however, undisputed
evidence even if it is contrary to the finding. 
Id.  That is, we must
consider evidence favorable to termination if a reasonable factfinder could,
and disregard contrary evidence unless a reasonable factfinder could not.  Id.








We must
therefore consider all of the evidence, not just that which favors the verdict.  Id.  But we cannot weigh witness credibility issues
that depend on the appearance and demeanor of the witnesses, for that is the
factfinder=s province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the factfinder=s determinations
as long as they are not unreasonable.  Id.
at 573.

In
reviewing the evidence for factual sufficiency, we must give due deference to
the factfinder=s findings and not
supplant the judgment with our own.  In
re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006). 
We must determine whether, on the entire record, a factfinder could
reasonably form a firm conviction or belief that the termination of the
parent-child relationship would be in the best interest of the child.  See Tex. Fam. Code Ann. ' 161.001(2);
C.H., 89 S.W.3d at 28.  If, in
light of the entire record, the disputed evidence that a reasonable factfinder
could not have credited in favor of the finding is so significant that a
factfinder could not reasonably have formed a firm belief or conviction in the
truth of its finding, then the evidence is factually insufficient. H.R.M.,
209 S.W.3d at 108. 

B.  Best Interest of the Child








There is
a strong presumption that keeping a child with a parent is in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child=s best interest.  Tex. Fam. Code Ann. '
263.307(a) (Vernon 2008).  The following
factors, among others, should be considered in evaluating the parent=s willingness
and ability to provide the child with a safe environment:

the child=s age
and physical and mental vulnerabilities; the frequency and nature of
out-of-home placements; the magnitude, frequency, and circumstances of the harm
to the child; whether there is a history of substance abuse by the child=s family
or others who have access to the child=s home;
the willingness and ability of the child=s family
to effect positive environmental and personal changes within a reasonable
period of time; and whether an adequate social support system consisting of an
extended family and friends is available to the child.  Id. ' 263.307(b);
R.R., 209 S.W.3d at 116.

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)    the desires of the child;

 

(B)    the emotional and physical needs of the
child now and in the future;

 

(C)    the emotional and physical danger to the
child now and in the future;

 

(D)    the parental abilities of the individuals
seeking custody; 

 








(E)    the programs available to assist these
individuals to promote the best interest of the child;

 

(F)     the plans for the child by these
individuals or by the agency seeking custody;

 

(G)    the stability of the home or proposed
placement;

 

(H)    the acts or omissions of the parent which
may indicate that the existing parent‑child relationship is not a proper
one; and

 

(I)     any excuse for the acts or omissions of the
parent.

Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976).  


 

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when
appropriate.  C.H., 89 S.W.3d at
27.  Furthermore, undisputed evidence of
just one factor may be sufficient in a particular case to support a finding
that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

C.  Analysis








Mother
complains that DFPS Apresented scant or no evidence
on many of the best interest factors,@ arguing
that DFPS did not present any evidence on the number of out-of-home placements,
any history of abuse, or evidence of repeated harm.  Furthermore, she asserts that A[t]he
uncontroverted evidence establishes the child is not afraid of [her] and there
are no psychological problems that would impair [her] ability to care for the
child,@ and
that she has a support system consisting of her two sisters and a
grandmother.  Although she acknowledges
her history of substance abuse, Mother points out that she Ahas
secured a job, acquired transportation, served all of her time on previous
convictions, and she no longer engages in prostitution to support a drug habit.@ 

We first
note that evidence supporting endangerment findings under family code section
161.001(1), which Mother does not challenge, can be probative of the section
161.001(2) best interest finding.  See
C.H., 89 S.W.3d at 28; see also In re D.M., 58 S.W.3d 801, 814 (Tex.
App.CFort
Worth 2001, no pet.) (AWhile Appellant=s
history, admissions, and conduct relating to drug abuse, and her inability to
maintain a lifestyle free from arrests and incarcerations[,] support the jury=s
endangerment finding, this evidence is also relevant to a best interest
determination.@).  Furthermore, a parent=s
inability to provide adequate care for the child, her lack of parenting skills,
her exercise of poor judgment, and her repeated instances of immoral conduct
may also be considered when looking at best interest.  In re C.A.J., 122 S.W.3d 888, 893
(Tex. App.CFort Worth 2003, no pet.).








Mother
argues that the evidence here parallels cases in which courts have found
insufficient evidence to support a best interest finding, citing In re
J.R.S., 232 S.W.3d 278 (Tex. App.CFort
Worth 2007, no pet.), In re W.C., 98 S.W.3d 753 (Tex. App.CFort
Worth 2003, no pet.), and In re K.C.M., 4 S.W.3d 392 (Tex. App.CHouston
[1st Dist.] 1999, pet. denied), disapproved of on other grounds by C.H.,
89 S.W.3d at 26, to support her argument.

However,
J.R.S. involved a private termination petition brought by a mother and
her husband against an incarcerated father serving a sixty-five year sentence
for robbery and a life sentence for armed robbery.  232 S.W.3d at 280.  This court concluded that the evidence of
best interest was factually insufficient because there was no evidence of the
children=s
desires, their emotional and physical needs, the emotional and physical dangers
to the children, the mother and her husband=s
parental abilities or programs to assist promoting the children=s best
interest, their plans for the children, the stability of their home, or how the
father=s
incarceration had any effect on the children or their best interests.  Id. at 284.  








Likewise,
in W.C., we held that the evidence on the best interest finding was
factually insufficient because, among other things, the mother fully complied
with her service plan in all respects except for her court-ordered child
support payments, and all of her drug tests were negative.  98 S.W.3d at 765. This court stated that
while there was evidence of past poor parenting skills, poor decision making,
and inadequate protection of the children, because the mother did everything
she had been asked to do and because no significant event occurred between the
time the Department planned to return the children to her and the termination
trial, the evidence to support the best interest finding was factually
insufficient.  Id. at 766. 

And in K.C.M.Cthe most
factually similar to this case in that the mother used drugs while pregnant
and, after the child was born, used cocaine on a daily basis and financed her
drug use through prostitutionCthe
court held that the evidence was factually insufficient when the mother
performed her service plan while in prison (participating in Alcoholics
Anonymous, a parenting program, GED courses, and other self-improvement
activities), had been drug-free and sober for the ten months prior to the
termination trial, and the child=s
attorney ad litem fervently argued that jail had turned the mother=s life
around. 4 S.W.3d at 396B99. 








In
contrast, here, the record reflects that although Michael was too young to
express his own desires, he was born positive for cocaine.  Mother, an admitted cocaine addict, was
discharged from a drug treatment program after his birth because of her failure
to participate in the program, and she tested positive for cocaine during the
month of the termination trial.  She also
failed to complete her parenting classes. 
Mother testified about nebulous plans to Akeep on
doing positive things@ but provided no concrete
testimony about how she would provide for Michael=s
emotional and physical needs or his safety.[8]  Although she testified that she had a car,
she also testified that she drove without insurance and said, AOkay,@ when
asked whether she knew that was against the law.  Scott, the CPS caseworker, testified that
Michael=s foster
mother had a good, safe, and stable home, that she had expressed an interest in
adopting him, and that he was thriving with his foster mother. 








Although
some of the testimony given by Mother and her CPS caseworker conflictedCspecifically,
Mother=s
ability to financially support MichaelCin light
of Mother=s history of dishonesty, which
had resulted in both of her sisters having criminal records based on Mother=s
arrests, and giving due deference to the trial court=s
finding, we conclude that based on the entire record, the trial court could
have reasonably formed a firm belief or conviction that termination of Mother=s
parental rights to Michael would be in Michael=s best
interest.  See H.R.M., 209 S.W.3d
at 108; C.H., 89 S.W.3d at 28. 
Therefore, we overrule Mother=s sole
issue.     

IV. 
Conclusion

Having
overruled Mother=s sole issue, we affirm the
trial court=s judgment.

 

PER
CURIAM

PANEL:  MCCOY, WALKER, and MEIER, JJ.

DELIVERED: February 18, 2010











[1]See Tex. R. App. P. 47.4.





[2]We use an alias for the child=s name.  See Tex. R. App. P. 9.8(b)(2).





[3]A home study was
subsequently conducted on another family member (a cousin), but she was not
approved because of her youth and financial dependence on her father.





[4]Scott testified that, per
Mother=s psychological
evaluation, it had been recommended that Mother attend Narcotics Anonymous (ANA@) meetings two to three
times a week.  Mother was supposed to
have a paper signed when she attended an NA meeting; Scott stated, A[E]very time I=ve kind of mentioned it
to [Mother] about the Narcotics Anonymous, it=s kind of like she really
doesn=t have time or it=s really not a big deal.@





[5]Mother testified that
even apartments that accepted criminals with felonies would not accept her
because her conviction was a drug charge felony and was too recent:  AIf [the conviction] was two years old or
something, they would have me do an extra deposit.@





[6]Scott gave the following
testimony:

 

Q.     Have you observed [Michael=s] foster mother=s parenting skills and
parenting abilities?

 

A.     Yes.

 

Q.     How would you describe them?

 

A.     She has the best interest of that baby.  She just takes excellent care of him.  He=s happy-go-lucky, he=s thriving, he=s happy, he=s gaining weight.

 

Q.     What have you seen [Michael=s] foster mother do that leads you to believe she=s a good parent?

 

A.     She has a good, stable home. 
She has employment, she=s always taking pictures of him, always talking
about him.  He=s always dressed
nice.  He smells good.

 

Q.     What=s the interaction like
between [Michael] and his foster mother?

 

A.     He loves her.  He knows
who she is.  He=s bonded well with her.

 





[7]The trial court also
terminated Father=s parental rights, but he
does not appeal. 





[8]Mother gave the following
testimony:

 

Q.     How are you going to provide shelter for [Michael]?

 

A.     When I=ll be able to get an
apartment.  Like I said, it=s hard for me to get an
apartment.  But if my sister will be
approved, I=ll be able to provide
shelter and provide Pampers and provide milk and doCeverything this lady is
taking care of, now I=ll be able to do.  Just because I=m down and out don=t mean I ain=t capable of taking care
of my own son.  I am.

 

Q.     Well, based on your testimony, you don=t even really have a
place to stay on your own with [Michael].

 

A.     Okay.  I can go to my
grandma=s house. . . .  She has no criminal background.

 

Mother
testified that she would give CPS her grandmother=s name for a home study Aright now[,] if you want
to, if you=ll let me.@